JOSEPH JARRETT *et al. v.* SAMUEL JARRETT *et al.*

&

JOSEPH JARRETT *et al. v.* JAMES JARRETT *et al.*

Decided November 17, 1877.

1877.
Special Term.

1. Mere inadequacy of price is not in itself sufficient to justify a court of equity in setting aside a deed.

2. Old age is not in itself sufficient evidence of incapacity to make a deed.

3. The point of time to be looked to by the court or jury, in determining the competency of a grantor to make a deed, is that when the deed was executed.

4. The condition of the grantor's mind, both before and after the execution of the deed, is proper to be considered in determining, what was his mental condition at the time, the deed was executed.

5. It requires more capacity to make a valid deed, than it does to make a will.

6. The presumption of law is always in favor of sanity at the time the deed was executed, of a person whose deed is brought in question; and the burden of proof then lies upon him, who asserts unsoundness of mind: unless a previous state of insanity has been established; in which case the burden is shifted to him who claims under the deed.

7. The evidence of witnesses present at the execution of the deed is entitled to peculiar weight.

8. The evidence of physicians, especially those who attended the grantor, and were with him considerably during the time it is charged he was of unsound mind. is entitled to great weight.

9. Next to physicians and those who were present at the time the deed was executed, either as attesting witnesses or otherwise,

are those, whose intimacy in the family has given them an opportunity of seeing the party at all times, and watching the operations of his mind.

10. The mere *opinions* of witnesses not experts are entitled to little or no regard : unless they are supported by good reasons founded on facts which warrant them : and if the reasons and facts upon which they are founded are frivolous, the *opinions* of such witnseses are worth but little or nothing.

11. Where a legal capacity is shown to exist in the grantor, and he had sufficient understanding to clearly comprehend the nature of the business, and he consented freely to the special matter about which he was engaged, and no fraud or undue influence is shown to have been used to bring about the result, the validity of the deed cannot be impeached, however unreasonable, imprudent or unaccountable, it may seem to others.

12. Even after a verdict is rendered by a jury on an issue out of chancery, if upon the proofs, as they stood at the hearing, an issue ought not to have been ordered, it is the duty of the chancellor. notwithstanding the verdict, to set aside the order directing the issue, and enter a decree on the merits, as disclosed by the proofs on the hearing, when the issue was directed.

13. It is the duty of an appellate court, in reviewing a decree founded on the verdict of a jury rendered on an issue out of chancery, to look to the state of the proofs at the time the issue was ordered, and if satisfied that the chancellor had improperly exercised his discretion in directing the issue, to render a decree, norwithstanding the verdict, according to the merits as disclosed by the proofs on the hearing when the issue was ordered.

14. The chancellor may in the exercise of his discretion either direct an issue, or refuse to do so ; but this discretion must be properly exercised, and a mistake in its exercise is just ground of appeal.

15. Where there is such a conflict of evidence, that it is so nearly balanced, as to make it doubtful, on which side is the preponderance, an issue ought to be directed ; but where, though there be a conflict, it is not of such character, no issue ought to be ordered.

16. Such doubt in the mind of the chancellor must not be a factitious but a reasonable one, justified by such conflict of the evidence.

17. Section 4 of chapter 131 of the Code does not change the gen-

eral chancery practice as to the ordering of issues; it only specifies *where* the issue *may be tried*, in the circuit court that directs it, or any other circuit court it may designate.

18. Under section 59 of chapter 125 of the Code the only effect of an answer, responsive to any material allegation of the bill, is to put the plaintiff on proof as to such allegation.

Upon the petition of Samuel Jarrett and James Jarrett, Jr., an appeal was granted from, and *supersedeas* allowed to, a decree of the circuit court of Greenbrier county, rendered at its October term 1873, in three causes in chancery, in said court then pending, which were heard together, and which were instituted by Joseph Jarrett and others heirs of James Jarrett, deceased, against Samuel Jarrett, James Jarret, Jr. and others, the object being to set aside four deeds executed by said James Jarrett in his life time, to said Joseph Jarrett, James Jarrett, Jr., and one Samuel Leonard by which decree the bill as against Leonard was dismissed and the deeds to the petitioners, Samuel Jarrett and James Jarrett, Jr., were set aside.

Hon. Homer A. Holt, Judge of the eighth judicial circuit, rendered the decree complained of.

JOHNSON, JUDGE, who delivered the opinion of the Court, furnished the following statement of the causes:

In July 1870 Joseph Jarrett and others, heirs-at-law of James Jarrett, deceased, filed their bill in the circuit court of Greenbrier county, against James Jarrett and others, also heirs of said James Jarrett, deceased, which bill is in substance as follows:

That complainants and defendants are the heirs-at-law of James Jarrett, deceased; that said James Jarrett died on the 24th of February 1870 intestate; that he had been the owner and in possession of large and valuable tracts of land; that for many years before his death he had been in exceedingly low health, confined for the greater part of the time to his house and bed, and so afflicted that for much of that period, and for a long

time continuously before his death, his mind was so

much impaired as to render him wholly incapable of attending to, or transacting any business; that to such an extent had his mental inability progressed, that none of the business transactions which he attempted for several years preceding his death, could be held valid and binding upon him during his life, nor can they be now so held, or regarded by the court; that said James Jarrett had great confidence in the business capacity of his son, the defendant, James Jarrett, who is, and was an intelligent business man, and had acquired that influence over his father in his weakened and imbecile condition, that enabled him to manage and control the old gentleman as he chose; that availing himself of this condition of things, he succeeded by fraud, misrepresentation and deceit, in obtaining from his father several tracts of land, for prices greatly below their actual value, which he now holds.

The plaintiffs charge particularly, that by fraud and deceit in 1861 he so imposed upon the said James Jarrett, as to obtain a conveyance for a tract of land on Wolf creek, in Monroe county, West Virginia, containing —— acres, at a price entirely inadequate, paying for the land, with the corn, bacon, stock, &c., upon it, which corn, bacon, stock, &c., were worth several thousand dollars, only the sum of $10,000.00; while, for the land itself, the said James Jarrett had at one time been offered $20,000.00, at another, $15,000.00, in gold; that this pretended purchase was made about the commencement of the war, when, in addition to the infirmities resulting from old age, the health of the said James Jarrett was much disturbed by the excitement incident to the war; and his mind was in such a condition as to render any deed, he might attempt to make, invalid and void; that the said defendant, not relying upon the conveyance obtained at the time of said purchase, went before the Legislature of West Virginia after the war closed, and, without notice to any one, procured what he claims to be a ratification of the said deed; but which the plaintiffs

claim can have no effect to give validity thereto ; that subsequently, by the same fraudulent and deceitful means, he procured from his father a new conveyance for the same lands, at a time when his mental condition was weaker, and more impaired, if possible, than when the first conveyance was made ; at a time, in fact, when he was entirely and hopelessly *non compos mentis;* and the plaintiffs further charge, that in 1868, when the said James Jarrett was in the same imbecile condition, the defendant, James Jarrett, by fraud and imposition succeeded in procuring from his father a deed for four hundred and thirty acres of land on Muddy creek, in the county of Greenbrier, known as the "home place," for a price far below its real value, paying only $25.00 per acre therefor, when it was worth from $50.00 to $75.00 per acre. The prayer of the bill is, that said deeds of conveyance be set aside and annulled, and the lands partitioned, or sold and the proceeds distributed among the heirs-at-law of said James Jarrett, deceased ; and for general relief.

James Jarrett answered the bill, admitting that he had purchased the two tracts of land described in the bill, and that he had received deeds from his father for the same ; and that he is in possession of both said tracts, and claims title thereto under the said conveyances. He denies every material allegation or charge in the bill, in relation to his father's imbecility, or inability to make a valid conveyance at the times the deeds were made, and every charge of fraud, misrepresentation, or deceit ; in short, everything in the bill impeaching the validity of the said deeds, or either of them.

Neither the bill nor answer is sworn to.

The plaintiffs at the same time filed a bill against the same defendants, in which substantially the same allegations and charges are contained against Samuel Jarrett, impeaching a conveyance made by the said James Jarrett in the spring of 1868, for some one hundred and forty-eight acres of land on the waters of Muddy creek,

in the county of Greenbrier, to his son, Samuel Jarrett.

The bill contains the same prayer as the bill filed against James Jarrett and others.

Samuel Jarrett answered the bill in the same manner, that James had answered the other. Neither the bill nor answer is sworn to.

Copies of the deeds referred to in the said bills, respectively, are filed.

In the deed to James Jarrett for the home place is the following clause: "It is distinctly understood that the said James Jarrett, Sr., reserves the two lower rooms in the end he stays in, of his dwelling house, during his natural life." Also the following: "It is understood that the said James Jarrett, Sr., retains a lien on the land for the purchase money, and full possession to be given of the premises on the 1st day of January 1869, except the rooms above excepted."

A bill was also filed by the same plaintiffs against the same defendants, with similar allegations and charges as are contained in the two other bills, against Samuel Leonard, a grandson of said James Jarrett, Sr., impeaching a deed made to him and Andrew Robinson by said Jarrett, for a tract of land in the said county of Greenbrier, on the 23d day July 1867.

Said Leonard filed his answer, denying all the material allegations and charges in the bill impeaching the said conveyance.

On the 16th day of June 1873 " these three causes came on to be heard by consent together ; and by like consent the depositions taken in either one of said causes, and which are admitted as evidence therein are to be read in the others." And the said causes came on to be heard upon the bills, answers with replication to each, and upon the exhibits filed, depositions of witnesses &c. ; and the decree proceeds: "Upon consideration whereof the court is of opinion that it sufficiently appears, that at the time of the making of the deed of the —— day of April 1862, mentioned in the bill in the first of said

causes, conveying by James Jarrett to the defendant James Jarrett, Jr., the Wolf creek tract of land, the said James Jarrett, Sr., was clearly capable of making said deed, it is therefore adjudged, ordered and decreed, that as to said deed and tract of land the plaintiff's bill be dismissed. And the court being of opinion, that there is a conflict in the testimony, as to the competency of the said James Jarrett, Sr. to make the other deeds, mentioned in said three bills, which renders it proper for the court to direct an issue to be tried by a jury, to ascertain the competency of said Jarrett to make said deeds, it is therefore adjudged, ordered and decreed, that an issue be made up and tried by a jury at the bar of this court, to ascertain whether the said James Jarrett, Sr., at the time of executing the said deeds, to-wit: the deed to Samuel Leonard and Andrew Robinson, dated the 23d day of July 1867, and the deed to James Jarrett, Jr., and the deed to Samuel Jarrett, both dated on the 24th day of March 1868, was mentally capable of making said deeds, or either of them ; and if either of them, and not the other, which one; and upon the trial of said issue, such of the depositions read upon the hearing, as would be admissible upon the trial of an action at law, may be read to the jury. .

The issue was tried before a jury in November 1873, and on the 11th of that month the jury found the following verdict:

"We, the jury, find that the said James Jarrett, Sr., at the time of executing the deed to Samuel Leonard and Andrew Robinson, dated on the 23d day of July 1867, was mentally capable of making said deed; and we further find that at the time of executing the deed to James Jarrett, Jr. and the deed to Samuel Jarrett, dated the 24th day of March 1868, the said James Jarrett was not mentally capable of making said deeds."

On the 26th day of November 1873, the court entered a decree in the causes as follows:

" These causes came on again, this the 26th day of

November 1873, to be heard together, by consent, upon the papers formerly read, and the verdict of the jury empanelled at the bar of the court, and the certificate of evidence, in pursuance of a former decree in those causes, and were argued by counsel. On consideration whereof, and it appearing to the court from said verdict, that said James Jarrett, Sr., deceased, at the time of executing the deed to Samuel Leonard and Andrew Robinson, dated on the 23d day of July 1867, was mentally capable of so doing, and that at the time of the execution of the said deeds to James Jarrett, Jr. and Samuel Jarrett, respectively, both dated on the 24th day of March 1868, the said James Jarrett, Sr. was not mentally capable of executing the said deeds last named and the court being satisfied with the said verdict of the jury, it is adjudged, ordered and decreed, that the bill of Joseph Jarrett and others against Samuel Leonard and others, be dismissed, and that the defendants recover their costs, and it is further adjudged, ordered and decreed, that the deeds aforesaid to James Jarrett and Samuel Jarrett, be and they are hereby set aside and annulled; and that the plaintiffs in said suits against James Jarrett and others and Samuel Jarrett and others, recover their costs from the said James Jarrett and Samuel Jarrett, respectively."

At the time the issue was directed, the testimony of for the plaintiffs on the question of the grantor's capacity was in substance as follows, viz:

*Geo. H. Lewis*—Occupation, farmer; lived one-half or three-quarters of a mile from Jarrett, deceased; had been acquainted with him a long time; had transacted some business with him; "thought his mind was not as good as it used to be: it was my opinion, whether I was right or wrong."

*Charles Buster*—From 1861 to 1865 was living most of the time in county of Alleghany; in 1866 removed to his place adjoining Jarrett; in 1866 had but little opportunity of judging as to the condition of his mind, and could express no opinion as to that matter; after

1877.
Special Term.

Jarrett *et al.*
v.
Jarrett *et al.*

that time, it was his opinion he was not competent to transact business; sometimes he would not recognize me, and sometimes he would; saw him once under the influence of liquor.

*George Miller*—Lived on Mr. Jarrett's place six years previous to 1870; during that time did not think him competent to make a will or deed; at times for five or ten minutes seemed to have as much sense as ever he had; saw him on the next day after he had sold his land; I asked him whether he had sold his land, said he had not sold, but had rented it; Jarrett was often drunk; did not believe he was capable of doing business, even when he had no liquor: but was worse when he had it; in 1867 or 1868 witness obtained two bonds from him for collection; believed he transacted the most of his business, sometimes one, and then another would assist him.

*Ballard Carraway*—Lived about two and one-half miles from Jarrett; had known him ever since he knew anybody; did not see him very frequently in the latter years of his life; could not say whether he retained his mind down to the time of his death; there was a change in him; but whether it was caused by drinking liquor, or something else, could not tell; the change occurred immediately after the war; saw him at times when "he was perfectly at himself, and at other times when he was not;" thought he grew worse after 1865; could not tell whether he was at all times in a condition to protect his own interests or not: or whether he might have been deceived and imposed upon.

*John Forren*—Was not particularly acquainted with him; never was in his company but twice; in the fall of 1867, thought he was not at himself from some cause.

*David G. Baker*—Lived three miles from him; had known him for twenty-five years; in 1866 and 1867 so far as he could see, thought he was in the full possession of his mental faculties; did not know whether he was a good judge; but after 1867 did not think he was capable of transacting business; in his opinion in the

spring of 1868, he was not competent to make valid deeds.

*Charles Carraway*—Frequently saw him from 1861 to the time of his death; the conditions of his mind varied; was not, in judgment of witness, competent to attend to important business; sometimes was in better condition than others; on a good many occasions, it would have been easy for designing persons to have imposed upon him; on other occasions it would not have been so easy; on some occasions did not recognize witness.

*John A. Rogers*—Lived in the house of Jarrett a part of the winter of 1862; did not think he was then, all the time, capable of attending to himself; was often incapable of attending to business.

*Henry Forren*—Did not think he was capable of attending to business when he saw him; although he might have had more sense than he (witness) had; thought he was in a condition to be easily imposed upon, although he might have been drunk; never saw him drink.

*Samuel C. Forren*—Since the war had seen him often; had worked for him some; had frequent conversations with him; did not think he was always at himself; went on one occasion to work for him for grain; said he did not know witness; had no work for him, unless he would rub his legs; thought he could be imposed upon at times; he made contracts with witness for work and paid him.

*Alexander H. Anderson*—Resided six miles from Jarrett; saw him two or three times while Witcher's battalion was encamped there; and may have seen him before that time during the war; saw him frequently after the war; did not consider him sane at any interview had with him, either while Witcher's battalion was there, or afterwards; of course he was not in witness' opinion competent to attend to business; could not say how he might be influenced.

*Andrew D. Johnson*—Lived about four miles from Jarrett; his mind and body grew frail for several years

1877.
Special Term.

Jarrett et al.
v.
Jarrett et al.

before his death; did not think he was competent or able to attend to business generally.

*Dr. William Pricket*—A physician; lived about three miles from residence of deceased; was not well acquainted with him; saw him a few times during the last years of his life; saw him on two occasions, professionally, at his own house; thought it was in the summer of 1867; was of opinion that he was in his dotage, and that his mind was feeble; did not think he was competent to transact business of any great importance; would say that the mind must sympathize with and share the weakness and decline of the body incident to extreme old age; opinion of witness that all men, pretty much, when they arrive at the age of Mr. Jarrett in 1867, are of feeble mind; that the mind does suffer with the body; so far as witness knew, his body may have been as healthy as men of his age; did not know that he was suffering under any disease, except in his leg.

*Jacob H. Lewis*—Lived near deceased; thought that in the latter years of his life he was in his dotage, and had not full possession of all his mental faculties; did not suppose he was competent to transact all business judiciously; supposed there was a gradual decline of his mental powers for at least ten years before his death; supposed he was incompetent to execute a valid deed for at least one or two years before his death.

*William McCorkle*—Was the barber who shaved deceased; said sometimes he appeared to be as sharp as anybody; at other times he would not seem to know anything much, or would let on so; his mind seemed to be very much enfeebled; sometimes thought he was in his dotage; liquor seemed to arouse him up considerably, and to brighten his ideas; did not know whether the use of liquor had the effect of deranging him or not; was his barber for a part of 1867; was frequently in his company, sometimes once, sometimes twice a week, and sometimes oftener; sometimes he would pay witness 50 cents, sometimes $1.00, sometimes $2.00, sometimes

$5.00; at one time he paid witness $10.00 to shave him a month; during the next week, went back, and he paid witness $1.00; went back the next week, and he offered to pay witness; when he told him he had paid him for a month's shaving, he gave witness 50 cents and told him to recollect it; witness then moved to Monroe, and went back next week, and he paid him $2.00; two weeks after, he paid witness 10 cents; told him it was too far for witness to come, and he said he reckoned it was; went to shave him once a week for twelve months; part of the time, had to go a mile and a half: and a part a few hundred yards; did not know how much he paid; kept account of about $50.00.

*Willis Tincher*—Bought some bacon of Mr. Jarrett in 1868; he did not appear to know witness at first; told him his name : and he then said witness could have the bacon; said : when Samuel Leonard came in I could get the bacon; it appeared that the keys to the smoke house had been lost; Leonard contended with Mr. Jarrett that he had the keys; by examining, the old gentleman found he had the keys in his pocket; the old gentleman did not find them in his pocket, but Leonard did.

*Robert Robinson*—Was acquainted with him from 1864 to the time of his death; saw him as often as once a month; there were times when he thought he was capable of transacting business intelligently, and times when he thought he was not; he was old and "doted:" and his mind was gone.

*Washington Brown*—The old man was feeble in body, and sometimes witness thought his mind was a little "shackling;" at other times, thought his mind was good.

*Lanty Kincaid*—Lived within two miles of deceased, for twenty years ; frequently saw him ; at times witness thought he was capable of attending to business, at other times not; had a. debt against him as constable, and summoned him : he said it was the first time he had ever been summoned in his life ; had some road tax which could not get settled ; judging from business transactions, and

from his conduct and conversation, did not think he was capable of transacting business intelligently.

*Morris Bryant*—Was in his employ as a shoemaker in 1867; was there twice: three or four days each time; at times thought he was not capable of transacting business: at other times thought he was; had conversations with him every day.

*Dr. Thomas G. Clay*—Had been acquainted with Mr. Jarrett since 1850; first impression was, that he was a man of very extraordinary mind; saw no marked alteration in his mind until about the commencement of the late war, when he became very passionate and cross with his family and others; thought his mind grew worse; did not see him from about the beginning of the spring of 1862 until the winter of 1863; according to witness's opinion, Mr. Jarrett's mind was in a state of imbecility previous to 1863, and it became worse afterwards; did not think he was capable of transacting business between 1865 and 1869, and that a designing person could easily have imposed upon him during that time; had been a physician since 1846; was a son-in-law of James Jarrett, deceased; witness referred to an agreement, and said, "it seemed to me to be an agreement not to take any part in any suit brought by any portion of Mr. Jarrett's family, should there be any suit brought; should there be a suit brought, and they would bring these lands to sale, any loss on the part of James Jarrett, Jr., or Samuel Jarrett, it should be made up by the property that my wife should become possessed of through her father's estate; that is about the purport of the agreement, according to my recollection, meaning the lands purchased by James Jarrett, Jr., and Samuel Jarrett, of James Jarrett, Sr.; I took but very little notice of the agreement."

In answer to the question who wrote the agreement referred to, he said:

" I was informed that Mr. Price wrote the agreement; but I think that Mr. James Jarrett Jr., copied and altered it from the original."

1877.
Special Term.
———————
Jarrott et al.
v.
Jarrett et al.

After saying that he had no recollection of signing more than one agreement of the kind referred to, a paper was handed him purporting to be signed by himself and wife, and he was asked if that was the agreement? He said it was. And on being asked in whose hand-writing it was, answered: "It is my own hand-writing."

In answer to the question: did you not on one occasion try to kiss the old man, and did he not take a cane to you, he answered:

"I was at old Mr. Jarrett's, and having some spirits with me, we both drank until we were somewhat intoxicated, and I proposed to take a kiss at parting, and he struck me with his cane."

*Margaret Clay*, the wife of Dr. Clay and daughter of James Jarrett deceased, did not think her father was capable of transacting business from 1865 to 1869.

*William George*—Had been acquainted with him sixty years, and joined farms with him. He was like all other men at his time of life, bowed down with age. Through the war saw nothing wrong with him; at times in 1867 and 1868 thought he was not mentally able to transact business. In 1868 saw him frequently, when he could see nothing the matter with him; he seemed to talk cool and rational as any man; at these times considered he was competent to transact business.

*Samuel Carroll.*—Am well acquainted with him, and frequently saw him during the latter years of his life; did not think after 1863 he was capable of transacting business intelligently; thought designing persons could easily have imposed upon him; lived about twenty-two miles from him.

*Samuel C. Ludington*—Was well acquainted with him for twenty-five or thirty years; visited him in 1866, to have conversation with him about a bond, executed during the war by witness to said Jarrett, inquired in the evening for bond, and he said he would hunt it next morning; he then gave witness several bundles of papers and told him to hunt the bond; looked through the pa-

pers and found no such bond, and so told him; he then said his son, James, had it, and that he would get it and give it to witness; at that time his mental condition in the evening was not good, but in the morning his mind seemed to be better; what made witness think his mind was impaired in the evening was, the repeated questions he would ask of the same thing; did not think he was capable of transacting business in the evening referred to; his mind was a good deal better in the morning, and witness could not say whether he could have been then easily imposed upon.

*William H. Montgomery*—Was acquainted with him; saw him once in 1867; was not much acquainted with him, except in business matters; in 1865, had a little transaction with him, could not notice there was anything wrong about him; he appeared to be feeble in both mind and body; went to see him in 1867, to get some money of him, thought his mind was a little affected; thought he was not capable of transacting business intelligently, *from what transpired between his son, Joseph, and myself*, in reference to his condition; opinion might have been derived from the information I had obtained before.

*Henry A. Robinson*—Had business transactions with him; sometimes he exhibited a great deal of shrewdness, and at other times it seemed as though he was almost insane; did not think he was capable of transacting business; recollected an instance when he thought he showed incapacity, which was in December 1868, or January 1869.

*Lewis B. Littlepage*—Thought him "out of fix someway," but whether he was capable of transacting business could not say.

*Mason Mathews*—had known him for forty years; saw him in the spring of 1865, and again in 1868; thought a great change had taken place in him both physically and mentally; In the spring of 1865 had received frequent verbal messages from him that he wanted to see him (witness); went over to see him, and found him in

1877.
Special Term.

Jarrett et al.
v.
Jarrett et al.

a very feeble condition; remained there for some time thinking that he would mention what he wanted with witness; finding he did not do so, told him he had received messages to come and see him, and asked upon what business he wished to see witness; he smilingly said "he had no business, he merely wanted to see me." Witness then wanted to settle with him for bacon, he had received from him during the war, but he seemed to have forgotten all about it. Witness also settled another account with him, which he seemed to have forgotten. From his general conversation witness concluded, that his mind was much impaired. In the fall of 1868 he visited Lewisburg in a buggy and when in front of the bank building he appeared to have no knowledge of his locality. Heard him say in the fall of 1868, that he had not sold his land but had rented it out. Did not think he was competent to transact business.

*Alexander F. Mathews*—Acquaintance with Mr. Jarrett was very limited; saw him but once before a committee was appointed for him, and that was in the spring of 1867, when his deposition was taken at his own house; he appeared to be rather in a state of lethargy; he said but little, and only when spoken to; remarks seemed to be desultory and incoherent; his deposition was taken, and so far as witness could recollect, his answers were vague and unsatisfactory; attention was not given particularly to the state of his mind, and witness was not prepared to say, whether he might have been imposed upon or not, he seemed to be an extremely old man and in his dotage.

The committee, of whom witness was one, referred to in the deposition of the last witness, as the record discloses, was appointed by the circuit court of Greenbrier county, at the October term 1869.

*Robert Huggins*—Knew him for twenty-five or thirty years, and lived near him; thought in 1862 he failed a little, and failed rapidly from that time to his death; thought from 1865 to his death he was incapable of

transacting business intelligently; thought his mind was in better condition sometimes than others; was not present in the fall of 1868, when Joseph Jarrett drove the cattle of James Jarrett, Sr. away; was passing through the field and heard some one hallooing; turned and went to where they were; came to old Mr. Jarrett lying in a rut in the road; several helped the old man up and took him to the house; he was very mad about the cattle going away, and added that they had taken some cattle that he did not intend to go; heard Samuel Jarrett say the old man did not know anything, and he was becoming a bigger fool every day. This conversation took place three or four years ago.

*Andrew Jarrett*—Is a grandson of James Jarrett, deceased; did not think he was capable of transacting business intelligently; he was in a feeble condition in body and mind; on one occasion he rented a pasture field to Mr. McClung, when his own stock was needing grass, or would need it that winter, as he had no feed for them: and they died that winter for want of food; he also was at the house of deponent, and acted as though he did not know what he was doing; am one of the plaintiffs in this suit. This was in 1867.

*William A. Anderson*—Saw him in 1862; did not think his mind was right then. In 1862 was sent there with a message from Colonel Crook for him to come for some horses that had been taken; he remarked that he would not bother his mind about them; did not think him competent to transact business since 1862; told the tax collector, that he had nothing but the land on Keeny's Knob and if he chose to make his taxes out of that he could do so.

*Madison McClung*—Was passing the road in the latter part of the summer or fall of 1868: Mr. Jarrett called to witness from the porch, and from the manner in which he spoke, was convinced that he did not know witness; thought at the time he knew but little of what was said; at that time did not think him capable of trans-

acting business; suppose the road was thirty yards from the house; he might or might not have been under the influence of liquor; never knew he drank at all.

*Robert F. Dennis*—Was passing by the late residence of James Jarrett in 1866, or early in the winter of 1867; as a friend called to see him; first time he had seen him since the war; regarded his mind as very much impaired by age; his memory was certainly far gone, but could not say that he was so in his dotage that he could not transact any ordinary business; saw him again in the spring of 1867; first impression was strengthened; it was this conversation that led witness to believe his mind was impaired: he requested witness to take charge of his bonds, notes, &c., and proceed to collect them; told him he had already placed them in the hands of two very competent attorneys (Messrs. Pitman and Mathews), and that they were proceeding to secure them for him; he denied this, and said he knew nothing about Mr. Pitman, and Mr. Mathews was too young a man, or too young an attorney, to take charge of his business, and requested me at once to take his papers out of their hands; quieted him by promising to become associated with them; this arrangement seemed to satisfy him; he seemed to have forgotten that he had ever spoken to or seen either Pitman or Mathews in reference to his business, and witness does not, of his own knowledge, know that he had; should think that he could have been easily influenced.

*Cornelius Rodgers*—Lived within four miles of deceased; had known him for thirty years; there was a difference in his mind first, during the years of the war; his mind appeared to be torn up and disordered; in 1866, 1867 and 1868, his mind was very much gone from him at times; think he was not in a condition to transact important business intelligently; left some money with him in 1865 for corn, and he afterwards denied selling the corn and receiving the money, and refused to let witness have it; did not recollect of seeing him after

that, until shortly defore he died; at that time he appeared rational; called witness by name, and asked why he had been so long in coming to see him.

*James Haynes*—Was acquainted with him for four years intimately; lived on Joseph Jarrett's farm, about three miles from James Jarrett; did not see him frequently; preached at his house; visited him several times when he was sick; intimate acquaintance commenced in the fall of 1865, and ended in the fall of 1869 he was in his dotage; think he could have been easily imposed upon; he often repeated the same, or similar things, during a short conversation; on one occasion asked him his age, he referred to a date that made him one hundred and forty years old; his conversation was disconnected; seemed often to be in a kind of stupor, from which it would be necessary to arouse him; he paid his subscription sometimes in money and sometimes in produce; think his mind was better at sometimes than others.

*Clark Jarrett*—Grandson of deceased; thought he was not capable of attending to business since the spring of 1864; this opinion is founded on "the way he transacted his business, and seeing his estate smuggled and squandered before his eyes."

*Leonard Jarrett*—Another grandson of deceased; did not think he was capable of doing business of any kind, from 1864 to 1868; what made witness think so, was, because he did not care what went with his property, and often he would not know him; had heard James Jarrett say his father was not capable of doing any business.

*Rosanna Argabrite*—Was a widowed daughter of deceased; lived with him eleven months in 1863, and from 1866 to 1869 all the time; was his nurse and housekeeper; went there in 1866 under a verbal contract made with him, at $1,000.00 per year; did not think he was competent to make the contract, and did not rely upon it, but claimed of his administrators $1,000.00 per

1877.
Special Term.

Jarrett et al.
v.
Jarrett et al.

year for her services; did not think he had his right mind in 1862, nor at any time after that; gives a number of reasons for her opinion; he abused her mother when he had theretofore been kind; acted in various ways that convinced her he was not competent to transact business; did not see any change in his mind from 1863 to 1866; heard Thomas G. Clay, Joseph Jarrett and Riley B. Cook frequently speak of having a committee appointed for him; did not think his mind ever got any better, yet at times it was easier to nurse and take care of him; he became more feeble in body, and more troublesome both in body and mind in February or March 1868; Handly came there and talked with her father; witness went there and Handly observed: "Is it possible that James Jarrett has gone to Wheeling?" told him he had left that morning; said he expected to have met him there, that he had got him to come and survey the land; her father then observed that he knew nothing about it: to send for Samuel Leonard; he was at the sugar camp: did so, and he came, and they went to surveying the land; her father said, if that land was to be surveyed, he did not know who got it done; that he did not want Handly; did not send for him, and had no use for him; that Jim Jarrett and he would do anything—steal land, swear lies, survey another man's land, or do anything that was mean; then the witness said: "There, now, you have it, and there was a good deal more to the same effect." He would look at the deeds and deny them, and said he never got Handly to survey the land; and after the bonds were given which spoke of the lands being James's and Samuel's, he would deny having received such bonds. The deeds were presented to him the next morning after they were written; and he denied knowing anything about them. Witness details an incident, which she says occurred the evening before the deeds were executed, showing that he was exceedingly filthy in his action. Witness was about when the writings

were prepared, and she knew they were being written. Witness further deposed that Samuel Jarrett, James Jarrett and Mr. Handly were in the room, where the papers were prepared; had heard her father say he was afraid James Jarrett would kill him: kept his gun loaded for some time, to protect himself against James; also feared James would burn the house; on one occasion, at night, he got scared, and said the barn was burning, and had deponent go out several times to see if it was not on fire; when he was told it was not, he said it was, for he knew Jim would burn both house and barn, and he was looking for it to be done that night; this occurred shortly after the deeds were made; anything you wanted from him or wanted him to do, all you had to do was to "pester" him awhile and he would give way; never heard James say that a committee should be appointed for his father; heard him say, "there should be somebody besides Leonard; that father was not capable, and could not do himself, and Leonard would not do;" at that time Leonard was pretending to take care of things out doors; have heard Leonard frequently say that father was not capable of transacting business; heard Samuel Jarrett say so once; then he said, "no one could please him any more, he had got so childish;" this was in 1866.

When Mr. Handly was there, doing the writing and fixing up the deeds; witness told James Jarrett, in the presence of Mr. Handly, that if she had but a quarter of a dollar's interest in the land, that he could not buy it, that the property was all gone, or going, and that she wished what was in the land and coming to her to stay there; he made some short reply and went ahead with business; the reason witness had for this was, that she did not think her father was capable of selling the land, and did not think it was being sold for its value; thought she had a right to look after her interest, as she had no one to speak for her; was present part of the time when the business was being transacted; did not see them hand

the papers to him, but heard them ask him if he could read, and they read them, or a portion of them, to him and explained them to him; he refused to sign them for a while, saying he wished to have specie for pay, that greenbacks was no money at all; they coaxed at him sometime, and he gave up to them; it was James Jarrett and the magistrate, Mr. Huffman, that coaxed him; don't know that he wrote his name, but he consented for it to be done; don't know that persuasion and bothering him made him yield that time, yet do know that it had on other occasions, and there was a good deal of it done at that time; in answer to the question, if she was not interested in the suit, &c., said: "I reckon I am interested; if the plaintiffs are successful, I expect to reap some reward; if they are not, I do not expect to get anything, or very little;" her father did transact a great deal of business after 1862, and did it satisfactorily with honest people; but at other times witness was not so well satisfied with it; in the latter years of his life he used spirituous liquors, as he got older it had more effect upon him.

*The evidence for the defendants was substantially as follows:*

*Dr. Creigh*—Was a physician; had been practicing for about thirty-four years; was acquainted with Mr. Jarrett; had known him for a number of years; had practiced in his family; thought from the year 1847, and at intervals from that time up to the year 1868; attended him in a case of fever in 1847; attended him in the year 1857; thought in 1858 also; saw him in 1860 and 1861; attended him in 1866, 1867 and 1868, when he was laboring with an erysipelous affection of the leg, with a strong tendency to the development of dry gangrene, and required a strict system of medical and hygiene treatment; the last time he saw him was in the latter part of August 1868, or the first of September; never saw him when he thought he had not the possession of

his entire mental faculties; was uniformly struck with the clear and concise manner in which he explained his feelings and sensations; thought his mind was as clear and strong in conversation in 1868 as it was in 1847, and that his observation of men and his understanding of the relation of things, was as accurate and correct as at any time; the disease did not assume an inflammatory form ; and although such a disease might possibly affect the mind under other circumstances, yet in Mr. Jarrett's case, never observed a diminution in the clearness and strength of his intellectual perceptions, or in his capacity to comprehend any subject submitted to him; had a very limited experience in mental disorders; had seen some cases, but did not pretend to be an expert; believed it possible for a man of a very advanced age to retain his entire intellectual faculties, and have them as strong at eighty as at fifty; had seen two striking instances.

*Dr. C. A. Rupert*—Had been practicing medicine for twenty-two years; was acquainted with Mr. Jarrett; first acquaintance was early in the year 1866, and continued until the fall of 1868; regarded him generally, during that time, to be of sound mind; attended him professionally, a few visits, during the time, and transacted some private business for him; regarded him quite capable of transacting any business, with the exception of a short time while he was afflicted with dysentery, which rendered him quite feeble; this was in July 1866; considered his mind vigorous and clear generally.

*Dr. D. C. B. Caldwell*—Was a practicing physician; was acquainted with the late James Jarrett for many years ; had some business transactions with him ; was at his residence, thought in the summer of 1867, attending to magisterial duties, and during this visit had conversation with him, and also received his evidence in a trial; although infirm and suffering from evidences of morbid action, regarded his mind as sound, and of usual ordinary vigor ; prior to the examination of the case referred to, had one or two hours conversation with Mr.

Jarrett in regard to sundry subjects, his health being the principal; he freely conversed and described his condition.

*Harvey Handly*—Made the plat and survey referred to, at the instance of James Jarrett, Sr.; the survey was made on the 20th and 21st days of February 1868; Mr. Jarrett told witness that he wanted to sell the land, and wanted to know how much he had, and the object of the survey was to ascertain the quantity of land; he said he was going to sell the land to his son Jim, and that he wanted his son Jim to come and live with him, as he understood his wife was a good cook, and that he was getting old, and he wanted his son to take care of him, and he wanted to wind up his business, as he was not able to attend to it himself; said that his son (James) had been sent for to go to Wheeling as a member of the Legislature; he was not present; lived about twelve miles from the residence of James Jarrett; he sent his grand son, young Leonard, to know if witness could come over to see him, saying that he would send for witness when he wanted him; this was five or six months before witness went; a day or two before witness went he sent for him to come, and bring his instruments; when he went there he told him he wanted him to make a connected survey of all his lands at that place, putting them all in one survey. There were four or five surveys, and a part of a survey; when witness arrived, James Jarrett, Sr., had selected out all the deeds of the lands, that he wanted included in one survey; told witness the point to begin at, then to follow on the lines of one deed until he struck the lines of another deed, and so on from one to another, until he came to a sugar stump on the branch, that he would then have to make a course; from that point he told witness to go a straight line to two black oaks, on the William Jarrett survey, and with the line of that survey to the beginning; he appeared to be perfectly at himself, as clear as witness ever had seen him; after closing the survey, witness told him that he could not

make the plat and certificate of survey at that time; but that he would leave him a calculation of the area of the lands; he answered, that would do, that he would want witness to come again; in making the survey, found the lines as described by Mr. Jarrett; James Jarrett, Jr., after his return from Wheeling, told witness that his father wanted him to come over to do some writing for him; went accordingly in March 1868; when witness got there, the old man appeared indisposed to do anything, and during that day Samuel Jarrett and James Jarrett, Jr., came to an understanding with regard to a division of the lands; Samuel Jarrett being unwilling that the old man should deed all the lands to James; at the instance of James and Samuel Jarrett, witness prepared the deeds as they had agreed upon the division. The indisposition of the old man above referred to, witness supposed, was because Samuel Jarrett objected to his making the sales; next morning the deeds were signed; he took the deeds and objected to the handwriting of witness; said he thought before that, that witness wrote a good hand; witness had to read the deeds for him; after the deeds, had been read over, he asked Samuel Jarrett if he was satisfied, Samuel answered he was, and he then signed the deeds. The figures on the map were made by witness; before he commenced the survey, Mr. Jarrett asked him to examine the land, and to tell him what it was worth per acre, cash in hand, and witness put down the figures at $25.00 per acre, which he believed to be a fair valuation; was well acquainted with James Jarrett, deceased; he had a strong mind and clear head; he had the deeds all lying on his desk; he handed them to witness and said he had selected all the papers witness would need in making the survey; did not know whether any one had aided him or not; was two days in making the survey; stayed there with him in his room all the time witness was about the house; saw him three or four times a day, his health was feeble, but his mind was clear; had known him twenty or twenty-five years; could not discover any

difference in him; did not think his mind was impaired; he might not have had as vivid a recollection as formerly, but in business matters his mind was clear.

*S. R. Huffman*—Was the justice before whom the deeds executed on the 24th March 1868 were acknowledged; had been born and raised near the residence of the late Mr. Jarrett; was well acquainted with him; he was capable of understanding a deed at the time he acknowledged the deeds; had conversation with him at the time; was there but a few minutes; the old gentleman appeared to be perfectly rational.

*Samuel Leonard*—Was present when the said two deeds were acknowledged; his grandfather was "perfectly at himself" at the time.

*Samuel Carraway* —— Took the acknowledgment of James Jarrett, Sr., of the deed to Samuel Leonard in 1867; was fully satisfied that, at that time, he was fully capable of making a deed or transacting any other business.

*Madison McClung*—Was the justice before whom Mr. Jarrett, acknowledged the deed to the Wolf creek land; did not notice anything wrong with him at that time; the deed was examined particularly by him, and he discovered some little defect in it, which was corrected; had conversation enough to convince witness, that he knew what he was doing; saw him afterwards in 1866 or 1867, at which time had considerable conversation with him, and did not discover any defect in his mind.

*John Graham*—Was acquainted with him many years; always considered him a man of good, sound mind; thought it was in the spring of 1868 he made a survey of some land, which he had sold to Mr. Strous; submitted the plat and survey to Mr. Jarrett; and in conversation at that time, although he seemed somewhat slow, yet he appeared perfectly sane.

*James H. Arbuckle*—Was at the residence of Mr. Jarrett on the day the deeds were written, was in Mr. Jarrett's room; did not tell witness anything about the

transaction; was with him in the room, he supposed, some two hours; thought he was just as much "at himself" as witness ever had seen him; he was talking of the common news of the neighborhood, and made many inquiries of witness; he was always regarded as a very shrewd business man, and always kept his business to himself; as far as witness recollected, did not see anything in Mr. Jarrett that led him to suppose that he had lost any of his shrewdness. Had been commissioner of the revenue; acted as such from 1853 or 1855 to 1863; never saw any difference in Mr. Jarrett. Had known him for thirty years.

*William Carraway*—Was acquainted with him between thirty and forty years; saw him frequently; borrowed some money of him in September 1867; talked as rationally as he ever did. Thought he was competent to make contracts in March 1868.

*John W. Ellis*—Went to him for advice about a law suit in 1867 or 1868; thought in 1867 and 1868 he was competent to take care of his own interests in business transactions; had known him over forty years. Witness was a farmer, and about seventy years old.

*Allen T. Caperton*—Was well acquainted with the late James Jarrett, and had known him for many years; had been frequently engaged for him in his (witness's) professional business, and had business with him apart from such engagements; in his best days regarded him as a sensible business man. Saw him several times after the close of the war; last visit might have been eighteen months or two years, perhaps longer, before his death; had conversations with him on matters of business sufficiently to form a pretty good idea of the condition of his mind; he was not as sprightly as he had formerly been; was somewhat listless, but when engaged in talking upon business matters, he seemed to understand well what he was saying and what was said to him. He appeared to understand any business matter when his attention was called to it, or when his mind was aroused by busi-

1877.
Special Term.

Jarrett et al.
v.
Jarrett et al.

ness; he was not as quick and ready of comprehension, as when he was in full vigor, but his judgment was characterized by much the same caution and correctness. Should have regarded him of sufficiently sound mind to have executed either a deed or will.

*H. M. Mathews*—Was quite well acquainted with the late James Jarrett; had known him for a good many years; of his own knowledge knew nothing of him as a business man, until since the close of the war; had several business transactions with him in his (witness's) professional character, commencing, as well as witness can remember, in the spring or early in the summer of 1866; saw him last in Lewisburg, more than a year, as witness thought, before his death; was with him then only a few minutes; transacted no business then; was in a buggy with his son Joseph; went up to speak to him; did not seem to recognize witness at first, though when witness asked him if he knew him, said he did. On the other occasions referred to, when aroused, he seemed to understand the business matters, about which he and witness talked. Drew the deed from James Jarrett, Sr., to Samuel Leonard, for the eighty acres of land in question; Samuel Leonard came to Lewisburg and told witness that his (Leonard's) grand father had sent him to bring witness to his house; went with him and drew the deed at the request of Mr. Jarrett; thought of course he was in a condition to make, and capable of making the deed.

*Geo. W. Nickell*—Was acquainted with James Jarrett; saw him between 1865 and 1868, six or seven times; was stopping place going from home with cattle to the Big Mountain beyond the meadows; had frequent conversations with him; thought his mind good; saw Mr. McClung pay him some money on a contract for pasture; seemed to recollect the contract very well; thought it was either $20.00 or $25.00, balance on contract; thought he was competent to transact business on that day; it was about six months before he died; never saw him from

1865 to the time above referred to, when he thought him incapable of transacting his own business.

*Thomas McHuffman*—Was acquainted with him for thirty or thirty-five years; saw him in 1861, in April 1866, and was at his home about the 4th or 5th of January 1869; had no dealings, stopped to see him as an acquaintance; while he was not active enough to get about a great deal, considered that his mind was sufficiently good to transact any business.

*John Lowe*—Saw him several times a year; visits were principally on business matters; thought he was capable of attending to business.

*Henry W. Baker*—Lived within a mile and a half of Mr. Jarrett's twenty-one years, and saw him frequently; threshed his grain, thought in 1868; tried to sell him cattle in 1868; came to the house of witness to look at the cattle, but they could not agree on the price; came to the house of witness about ten o'clock in the morning and stayed until about two o'clock P. M.; saw nothing wrong with him, except he was very close; could not trade with him; at any time witness saw him he was capable of taking care of his own interests.

*Johnzey Leaf*—Became acquainted with him in 1867; regarded him as one of the most sensible men he (witness) knew on the waters of Muddy creek; thought he could attend to his own interests in business transactions.

*Nicholas Allen*—Had been slightly acquainted with James Jarrett, deceased, for fifteen years, but in the year 1867 had some business with him, and became better acquainted; bought a piece of land from him in that year; in the spring was to make payments at different times; brought him $60.00 or $65.00 to pay on the note before it was due, and thought he ought to deduct the interest, but he refused to do that; took him to be one of the sharpest men he knew.

*Joseph W. Stephens*—Lived in the house of James Jarrett, deceased; lived either in the house or near it from 1865 to 1869; his mental condition was good in opin-

ion of witness; was capable of transacting his own business; was present in 1868 when Joseph Jarrett took off a a lot of Mr. Jarrett's cattle; he was out of humor considerably; said that the cattle were gone, and he would get nothing for them; witness told him that Joseph Jarrett would bring him the money for them; he still contended he would not get a cent; witness told him he was foolish for talking so; but it turned out just as he said, as witness believed; he had a habit of drinking liquor; thought he was capable of attending to business, while under the influence of liquor; did not think that affected one in attending to business.

From and to the decree setting aside the deed to James Jarrett, and also to Samuel Jarrett, the said defendants, in the said suits respectively, were allowed respectively an appeal and *supersedeas*.

The causes were argued together at the January term 1875, of this Court, held at Charleston, and upon consideration of the causes, the Court reversed the decree cancelling the deeds, in each of the causes described, and, proceeding to render such decree in each of said causes as the circuit court ought to have rendered, dismissed the bill in each of said causes.

The opinion was prepared by JUDGE PAULL, and was concurred in by all the Judges, which it is deemed proper to insert in the report.

At the same term of the Court, a petition was filed by the appellees to have said decrees set aside, and for a re-argument of the causes, which was done; and at the August term 1877, of the Court held at Charlestown, the causes were re-argued and submitted.

The following is the opinion of JUDGE PAULL, referred to:

Bills in chancery were filed by the plaintiffs in the above causes, in the circuit court of Greenbrier county, in the year 1870.

The first bill, in the order here stated, alleges that the plaintiffs, together with the defendants, are the heirs-at-

law of James Jarrett, deceased, who departed this life on 24th day of February 1870, without having made a will; that he had been the owner and in possession of large and valuable tracts of land; that for years before his death he had been so much afflicted, that for a long time continuously before his death his mind was so much impaired as to render him wholly incapable of attending to, or transacting any business. And to such an extent had this mental imbecility progressed, that none of the business transactions, which he attempted to make for several years preceding his death, could be held valid and binding upon him; that the defendant, James Jarrett, being an active business man, had acquired his father's confidence, and in his weak and imbecile condition managed him as he chose, and succeeded by fraud, misrepresentation and deceit in obtaining a conveyance from his father of a tract of land on Wolf creek in Monroe county, containing—— acres for a wholly inadequate price. And again that in the year 1868 he obtained from his father, while in the same imbecile condition, and by the same means of fraud, misrepresentation and deceit, a deed for four hundred and thirty acres of land on the waters of Muddy creek, in Greenbrier county, at $25.00 per acre, the land being worth $75.00 per acre. With these allegations the bill prays, that these deeds may be set aside and annulled, and said lands partitioned or sold, and the proceeds distributed among the heirs-at-law of said James Jarrett, deceased. Copies of said deeds are exhibited with the bill.

The second of the bills, in the order stated, sets forth substantially, and in almost the same words, the same allegations, and that said defendants succeeded by the same means in procuring from said James Jarrett, deceased, while entirely *non compos mentis*, a deed to be made to Samuel Leonard, for eighty-one acres in the county of Greenbrier, and that said deed was executed for no valuable consideration whatever; and the bill ending with the same prayers. This deed to Samuel

Leonard was executed on the 23d day of July 1867, and was acknowledged by the grantor on the 29th day of July 1867.

The third of said bills, in the order named, contains the same allegations with the preceding two, and that the defendant, Samuel Jarrett, succeeded by the same means of fraud &c., in procuring from said James Jarrett, deceased, in the year 1867, a deed for one hundred and forty-eight acres at a wholly inadequate price, to-wit: at $40.00 per acre, when the same was worth from $60.00 to $75.00 per acre, and that said defendant well knew, that at the time of this transaction his father was entirely incompetent; the bill ending with the same prayers: The deed for this land, as also the deed to James Jarrett for the four hundred and thirty acre tract, bears date on the 24th day of March 1868, and was acknowledged on the 26th day of March 1868.

To the above bills the defendants, James Jarrett, Samuel Leonard and Samuel Jarrett, respectively, file their separate answers, explicitly denying all imbecilty or want of capacity on the part of James Jarrett, deceased, at the time of the execution of the deeds in question, and denying all fraud, misrepresentation and deceit on their part in the procurement of the same. Upon the issue thus presented in the pleadings, the parties, both plaintiffs and defendants, take by deposition the large mass of testimony found in the record, and upon the hearing of the case the court below, being of opinion that it sufficiently appears that at the time of the making of the deed of — day of April 1862 for the Wolf creek land by James Jarrett, Sr., to James Jarrett, Jr., mentioned in the bill in the first of said causes, the said James Jarrett, Sr. was clearly capable of making said deed, dismissed the bill as to said deed and tracts of land. And the court being of opinion, that there is a conflict in the testimony as to the competency of the said James Jarrett, Sr. to make the other deeds mentioned in said three bills, directed an issue to be tried by a jury to as-

certain the competency of said Jarrett to make said deeds.   A jury was accordingly impaneled and witnesses examined before them, and after sundry instructions were given by the court, a verdict was found reciting that at the time of executing the deed to Samuel Leonard dated on the 23d of July 1867, the said James Jarrett, Sr. was mentally capable of making said deed, and reciting further that at the time of executing the deed to James Jarrett, Jr., and the deed to Samuel Jarrett, dated the 24th day of March 1868, the said James Jarrett, Sr. was not mentally capable of executing said deeds.   Subsequently, in November 1873, the court, being satisfied with the verdict of the jury and adopting the same as reciting the truth, ordered that the bill as against Samuel Leonard and others be dismissed; and that the deeds to James Jarrett, Jr., and Samuel Jarrett be set aside and annulled, and the plaintiffs recover their costs &c.   From the decrees and orders made in these causes the defendants, James Jarrett, Jr., and Samuel Jarrett, have taken an appeal to this Court.

The first question arising upon the record, and the one chiefly argued before this Court, and now presented for our consideration, is connected with the ordering of the issue by the court below.   This action of the court in directing an issue is claimed by the defendants or appellants to be error; that the chancellor himself should, upon the hearing, have decided the questions arising upon the issue, as made in the pleadings, and dismissed the bills.   It is certainly true, as appears in the history of chancery practice, and of the causes bearing upon this subject, that courts of equity have, in the exercise of a sound discretion, the power to direct an issue to be tried by a jury; that this discretion is not arbitrary, but must be carefully exercised, upon proper deliberation, and is always the subject of appellate review.   I refer to what has been said by the courts, in a few causes, upon this subject.   In *Pryor* v. *Adams*, 1 Call. 382, it was held that the court of chancery should judge on the proofs be-

fore it, and in a clear case, decree thereon, without directing an issue; says Fleming, Judge, "But upon the merits, I think the right of evidence was clearly with the defendant; and that the *assumpsit* was not sufficiently proved, to entitle the plaintiff to a decree." The issue directed in this case was set aside, and the bill dismissed; see also 2 Call. 369, *Stanmrad* v. *Graves et al. ex'ors.* In *Samuels* v. *Marshall*, 3 Leigh 567, it was held, "if the evidence on a question of fact, in a suit in chancery, though various and conflicting, be such as ought to satisfy the chancellor's conscience as to the truth of the case, he need not direct an issue to try the fact:" A question of imbecility, from habitual drunkenness, in the execution of a deed was involved; it was a deed of gift; and this deed was set aside upon the hearing. Tucker, President, observed: "Had there been a *quid pro quo,* we might have hesitated; but surely the question is very different between a contract·for valuable consideration, and this *gift* by an habitual sot, of his whole estate; to take effect at his death, to the disherison of his sisters and natural heirs."

In *Dale et ux., ex'ors of Fulton* v. *Rosevelt,* it was held: "It rests in the sound discretion of the court to award a feigned issue or not; but when the truth of facts can be satisfactorily ascertained by the court, without the aid of a jury, it is its duty to decide as to the facts, and not subject the parties to the expense and delay of a trial at law." The court remarks: "it would be an abuse of that discretion, and the creation of a great and unnecessary expense, to award an issue, when the truth of the fact could be sufficiently and satisfactorily ascertained by the court itself." In *Smith's adm'r* v. *Betty et al.,* it was held: "In a chancery cause, if upon the state of the proofs, when the issue is directed, the bill should be dismissed, it is error to direct it; and although the issue is found in favor of the plaintiff, the bill should notwithstanding be dismissed at the hearing." In the case of *Kraker* v. *Shields*, 20 Gratt. 394, the court re-

marked: "Even when there is a conflict of evidence, it does not necessarily follow that there must be an issue; but the court may decide the cause without one, if its conscience is satisfied." Again in *Beverly* v. *Waldon*, 20 Gratt. 147, the court say: "that no issue should be ordered, until the plaintiff has thown the burden of proof on the defendant; that until the onus is shifted, and the case rendered doubtful by the conflicting evidence of the opposing parties, the defendant cannot be deprived, by an order for an issue, of his right to a decision by the court on the case, as made by the pleadings and proofs," and other cases there cited.

In the light of these cases, or of the law which they present as governing courts of equity in matters of this sort, our next step is to examine the proofs, whether the discretion of the court below has been properly exercised, directing the issue. In this examination we are to look only to the state of the proofs existing at the time, when the issue was ordered. This is the rule presented in *Pryor* v. *Adams*, 1 Call 382, and *Smith's adm'r* v. *Betty et al.*, 11 Gratt. 752 before cited. It may be here observed that the grantor in the deeds assailed, James Jarrett, Sr., was at this date an old man of upwards of eighty years, but was not suffering from bad health; that he had been a man of much physical strength, characterized by vigor of mind, and much shrewdness and capacity for business. And we observe again, that the transactions here complained of, to-wit: the design of selling these lands and of executing deeds therefor to the grantees, are first introduced to our notice, as having originated with the grantor himself. We have endeavored to make a careful and critical examination of all the testimony found in the record, and taken before the issue was ordered, with the view of ascertaining its weight, as it stands connected with the intelligence, (so far as we are to judge) of the witnesses: of the position which they occupied to the grantor, and grantees: of the circumstances under which they testified: and of the in-

cidents or facts on which they seek to base their judgments or opinions, as to the capacity or incapacity of the grantor to make the deeds in question, at the time they were made and acknowledged. As before stated, a large mass of depositions was taken, more than fifty in number, the greater part by the plaintiffs. It would subserve no useful purpose, to spread out this evidence here, and the results of our examination only will be stated.

It has been before stated, that the object of one of these bills was to set aside a conveyance made to James Jarrett, Jr., in 1862, and of another one of these bills to set aside a conveyance made to Samuel Leonard bearing date on the 23d day of July 1867. As to the first of these deeds the court itself upon the testimony found, in this record, (for these cases were all heard together upon the same proofs) that James Jarrett, Sr. was of sound mind at the time of executing this deed; and as to it dismissed the bill. As to the deed to Samuel Leonard the jury found, that the grantor was competent at the time of its execution, and the court being satisfied with the verdict dismissed the bill as to this deed which was acknowledged on the 29th day of July 1867. This judgment of the court, as to the soundness of the grantor's mind in the year 1862, and on the 23d day of July 1867, is most fully warranted by the evidence. Without looking into it further as to the condition of the grantor's mind at this particular time, it is sufficient to say, that we have the testimony of two of the counsel for the plaintiffs, Allen T. Caperton and Henry M. Mathews, gentlemen of large experience, learning and ability in their profession, who testify to the soundness of the grantor's mind at this time. They were then doing business for him, and this deed to Samuel Leonard was prepared by Mr. Mathews, under the dictation of the grantor, and bears evidence itself of his entire capacity. In addition to this, is the testimony of Robert F. Dennis, another lawyer of learning and experience, and whose testimony was taken by the plaintiffs themselves, who says that he

was unable to say that the grantor was incapable of transacting business; this was some time in the spring of 1867. Mr. Dennis was then with him, and was taking his deposition to be read in court. These gentlemen had full means of knowing whether the grantor was then either imbecile or insane; we need say no more; however, we believe the sound condition of the grantor's mind on the last of July 1867 was conceded in the argument of this cause on both sides.

We glance now at the evidence touching the condition of his mind, as it was on the 26th day of March 1868, when the deeds to James Jarrett, Jr., and Samuel Jarrett were acknowledged, covering a period of about eight months after the acknowledgment of the deed to Leonard. Of the witnesses for the plaintiffs, some fifteen or sixteen fix the date of the grantor's imbecility or insanity in 1862, or not later than 1864, and continue it down to 1869, or until his death. One of the deeds assailed was dated in 1862, and a number of these witnesses go back far enough to reach it ; while others begin two years later. There is no change from these earlier years, except, if any, that his condition grew gradually worse. During all the latter period of his life, from the summer of 1867, he was imbecile or incompetent, in their opinion, for the same reasons that he was from 1862 to 1864; but as their opinions cannot be regarded as correct, for reasons above given, as to the earlier period, neither can they be correct as to the later years of his life, resting, as they do, upon the same reasons. The depositions of these witnesses cannot be regarded as of any special value; of the remaining witnesses of the plaintiffs, some two or three, perhaps, have said that his unfavorable condition, when they saw him, might possibly be accounted for by his being at that time under the influence of drink ; others give no circumstances or incidents, as coming under their own observation, to justify what are merely expressions of opinion; two or three only speak of having business with him; and what they say refers more,

perhaps, to his memory; some two or three other gentlemen of intelligence and position testify to what seemed weakness or possible aberration; but their opportunities were not such as to enable them to form decided opinions; while two or three others give testimony favorable to his soundness of mind. The most of their statements may be reconciled with those peculiarities or excentricities incident to old age, but which fall short of exhibiting a condition of *non compos mentis.* No expression or utterance of any kind, which in itself would indicate imbecility or insanity, is shown. Two or three acts of indecent conduct in all his history, are referred to in one or two of the depositions, but we think they may be accounted for by other causes stated in the testimony, particularly by his habit of drinking at least to some extent in the later years of his life. In reply to this evidence, I briefly notice the testimony of the defendants. And first is that of Mr. Handly, who appears to be a witness of intelligence and respectability; he says he made a survey of these lands about a month or so previous to the sale, at the request of the grantor, who described the lands, and gave him the deeds, and mentioned certain particulars, which he would find when making the survey, and, that he intended selling these lands to his son James; that he wanted him to come and live with him, &c.; that his statements in regard to the lands were verified by the survey; that he also prepared the deeds for these lands, and was present when they were signed by the grantor, and that his mind was in sound condition at the time. Mr. Arbuckle was at the house of grantor on the day that Mr. Handly prepared the deeds; was in the room with the grantor for two hours, conversing with him, and says that he was just as much at himself as he had ever seen him; had known him for years; visited him when commissioner of the revenue. In the afternoon of that day he was present when the two grantees and Mr. Handly were talking about these lands and their proposed sale or purchase.

It does seem somewhat marvelous that these two parties were conversing about these transactions of importance in the presence of these two witnesses, in the house of the grantor, and who were holding converse with him, and yet they should never have discovered for a moment, that he was a helpless imbecile, or hopelessly insane. The magistrate also, who took the acknowledgement, and whose business it was to observe his condition, testifies to his competency. The testimony of these witnesses, who were present at the time of these transactions, is entitled to peculiar weight and value, from the means, which they had from the very nature of their business, of forming a correct opinion, or rather of knowing the true mental condition of the grantor. See opinion of the court in *Beverly* v. *Walden,* 20 Gratt. 147, and the cases there cited. The other witnesses also, who testify of his mental soundness during this period, the years of 1867 and 1868, speak, most of them at least, of their either doing business with him or for him, and that he understood the matters to which his attention was called. Three intelligent physicians, who visited him professionally during the later years of his life, testify to the sound state of his mind.

We think upon this review of the evidence that it decidedly preponderates in favor of the defendants, and establishes the mental soundness of the grantor at the time of the execution of these deeds. The burden of proof was on the plaintiffs to overcome by sufficient and satisfactory evidence the presumption of law, that every man is sane and capable of transacting business, until the contrary is made to appear. It is scarcely necessary to add, that it is not required that the grantor shall possess all the strength or vigor of mind, amid the infirmities of years, by which he was once distinguished; only that he was *compos mentis* or capable of understanding the nature of the business, as for instance the nature of a deed, which he is called upon to execute, and apprehend what he is doing. It is claimed that these lands

were sold for an inadequate price; but mere inadequacy of price is not a sufficient ground for setting aside a deed, if the vendor was entirely competent to transact business and was not overreached by fraud. No fraud seems to have been established in the present case. The grantor was selling to his own children, and was at liberty to do as seemed best to himself.

With these views of the evidence and by the law governing this case, we think it was error in the court below in directing an issue to be tried by a jury; and the decree directing the same, together with all subsequent decrees, orders and proceedings in the cause are hereby set aside and annulled; and this Court proceeding to render such judgment as the court below ought to have rendered, doth adjudge, order and decree that the bills of the plaintiffs against James Jarrett and Samuel Jarrett be dismissed, and that the appellants recover their costs.

*S. Price* and *R. F. Dennis*, for appellants, cited:

*Beverly* v. *Walden*, 20 Gratt. 154; *Wise* v. *Lamb*, 9 Gratt. 301; *Reed* v. *Cline's heirs*, 9 Gratt. 137; *Greer* v. *Greer*, 9 Gratt. 332; *Stanard* v. *Graves*, 2 Call 369; *Pryor* v. *Adams*, 1 Call 332; *Smith's adm'r* v. *Betty et al.*, 11 Gratt. 760; 2 Danl. Ch. Pr. 1285; *Samuel* v. *Marshall*, 3 Leigh 567.

*Mathews & Mathews*, for appellees, referred to the following authorities:

2 Story's Eq. Jur. §1479, 6th ed.; *Paul et al.* v. *Paul*, 2 H. & M. 525; *Carter* v. *Campbell*, Gilm. 159; *Fitzhugh's ex'ors* v. *Fitzhugh*, 11 Gratt. 210; *Lee's ex'or* v. *Boak*, 11 Gratt. 182; *Carrington* v. *Goddin*, 13 Gratt. 588; 2 Story's Eq. Jur., §1478; *Mettert* v. *Hagan*, 18 Gratt. 231; *Beverly* v. *Walden*, 20 Gratt. 147; *Massett* v. *Mason*, 20 Gratt. 527; *Kraker* v. *Shields*, 20 Gratt. 377; Taylor's Med. Jur., 624, 625, 626; 1 Beck. Med. Jur. 745,

748, 831, 834; 1 Whart. & Stello Med. Jur., §§6, 7, 19, 20, 30, 83, 87, 253, 256; 1 Jar. on Wills, 41, 42, 43, 51, 52, 57, 58, 66, 67, 74, 75, 76, 77, 78, 79; 1 Par. Con. 313; 2 Green. Ev. §371, note 2; 1 Green. Ev. §42; 5 Gill & John. 269, 301; *Stewart* v. *Lispenard,* 26 Wend. 313; *Harrison* v. *Rowan,* 3 Wash. C. C. 586; *Davis* v. *Calvert,* 5 Gill & John. 269; *Arentz* v. *Anderson,* Am. L. T. May 1871; *Samuel* v. *Marshall,* 3 Leigh 567; *Greer* v. *Greer,* 9 Gratt.; 3 Adams 79, 87, 88; 3 Centris 695; 1 Story's Eq. Jur. §268; *Blackford* v. *Christian,* 1 Knapp. 93; 1 Fonb. Eq., ch. 1 §3; *Holland* v. *Miller,* 12 La. An. 625; *United States* v. *Samperyne,* Hemp. 118; *Van Slyke* v. *Hyate,* 46 N. Y. 259; *Hunt* v. *Fornby,* 43 Ga. 79; 42 Ga. 46, 124, 334, 386, 429, 616, 639; 43 Ga. 176, 214, 216, 356, 390; *McLaughlin* v. *Bank of Potomac,* 7 H. 220; *Wise* v. *Lamb,* 9 Gratt. 301; Roane, J., in *Dilliard* v. *Thompson,* 1 Munf. 183; Cabell, J., in *Davis* v. *Turner,* 4 Gratt. 422; Lord Hardwick, in *Gilton* v. *Hancock,* 2 Atk. 428.

*J. W. Harris,* for appellees:

1st. As to when an issue out of chancery should be directed: *Wise* v. *Lamb,* 9 Gratt. 302, 307; 2 Danl. Ch. Pr. 1285 and notes; *Smith's adm'r* v. *Betty,* 11 Gratt. 761; 5 Leigh 206; 2 Story's Eq. Jur. §1479; *Powell* v. *Manson,* 22 Gratt. 188; *Marshall* v. *Thompson,* 2 Munf. 412; *Bullock* v. *Irvine's adm'r,* 4 Munf. 450; *Knibb* v. *Dixon,* 1 Rand. 249; *Douglass* v. *McChesney,* 2 Rand. 109; *Stanard* v. *Graves,* 2 Call 369; *Henry* v. *Davis,* 7 W. Va. 715, 730; *Davis* v. *Henry,* 4 W. Va. 571; *Hase* v. *Capehart,* 8 W. Va. 95; *Powell* v. *Batson,* 4 W. Va. 610.

2d. That where it was held error to direct the issue, there had been either no conflict in the testimony, or the plaintiff had failed to overcome the weight of the answer: *Wise* v. *Lamb,* 9 Gratt. 294; *Grigsby* v. *Weaver,* 5 Leigh 197; *Thornton* v. *Gordon,* 2 Rob. 719; *Reed* v. *Cline,* 9 Gratt. 136; *Pryor* v. *Adams,* 1 Call 382.

3d. That the burden of proof had been shifted; that there was an irreconcilable conflict in the testimony; that there were some forty witnesses on the one side, and twenty on the other; amongst the former, physicians, ministers, officers, members of the family and neighbors, testifying to the mental unsoundness of the grantor.

4th. That more mind is required to make a deed than a will: 1 Whart. & Stil. Med. Jur., §§19, 30; *Converse* v. *Converse*, 21 Vt. 168; *Harrison* v. *Rowan*, 3 Wash. C. C. 580; *Thompson* v. *Kyner*, 65 Pa. 368.

5th. As to the degree of mental soundness necessary to make a valid deed: Whart. & Stil. §§23, 83, 76, 81, 87, 94, 2; 2 Me. 305; 1 Story's Eq. Jur. §234.

6th. That if the issue was properly directed, the verdict cannot now be disturbed: *Carter* v. *Campbell*, Gilm. 159; *Paul* v. *Paul*, 2 H. & M. 525; *Lee's ex'or* v. *Boak*, 11 Gratt. 182; *Fitzhugh's ex'or* v. *Fitzhugh*, 11 Gratt. 210; *Henry* v. *Davis*, 7 W. Va. 717, 723; 3 Danl. Ch. Pr. 1306.

7th. As to rules governing new trials in such cases: 2 Danl. Ch. Pr. 1311, 1312; *Powell* v. *Manson*, 22 Gratt. 192; *Brockenbrough* v. *Spindle*, 17 Gratt. 28.

8th. On other points: *Lavell* v. *Gold*, 25 Gratt. 477; *Railroad* v. *Snead*, 19 Gratt. 354; *Samuel* v. *Marshall*, 3 Leigh 569.

JOHNSON, JUDGE, delivered the opinion of the Court:

Much interest having been taken in these causes, by the parties interested, and the causes having been re-submitted to the Court, and the able counsel on both sides having, with much earnestness and ability, contended for what they believed under the law and facts of the causes they were entitled to, I have endeavored, in the lengthy statement of the case, to so set out the substance of the evidence on both sides, touching the capacity of the grantor, as will illustrate the principles of the

79

opinion, and justify me in the conclusions to which I have come.

The following well-settled principles present themselves in these causes, and will guide us in a proper decision thereof:

Mere inadequacy of consideration is not in itself sufficient to justify a court of equity in setting aside a deed.

Old age is not in itself sufficient evidence of incapacity to make a deed.

The point of time to be looked to by the court or jury, in determining the competency of a grantor to make a deed, is that when the deed was executed.

The condition of the grantor's mind, both before and after the execution of the deed, is proper to be considered, in determining what was his mental condition, at the time the deed was executed.

It requires more capacity to make a valid deed, than it does to make a will.

The presumption of law is always in favor of sanity, at the time the deed was executed, of a person whose deed is brought in question; and the burden of proof then lies upon the person who asserts unsoundness of mind, unless a previous state of insanity has been established; in which case the burden is shifted to him who claims under the deed: *Hall* v. *Warren*, 9 Ves. 605.

The evidence of witnesses present at the execution of the deed are entitled to peculiar weight.

The evidence of physicians, especially those who attended the grantor, and were with him considerably during the time it is charged he was of unsound mind, is entitled to great weight; next to physicians and those who were present, either as attesting witnesses or otherwise, at the time the deed was executed, are those whose intimacy in the family has given them an opportunity of seeing the party at all times, and watching the operations of his mind. Of course it is understood, that in the weight to be given to the testimony of the different classes of witnesses, we have here enumerated, that

the witnesses themselves have no discredit cast upon them, either in cross-examination, the circumstance they detail or in any other way. But the mere opinions of witnesses not experts are entitled to little or no regard, unless they are supported by good reasons, founded on facts which warrant them ; and if the reasons and facts upon which they are founded are frivolous, the opinions of such witnesses are worth but little or nothing: *McDaniel's Will*, 2 J. J. Marshall 331 ; *Sloan* v. *Maxwell*, 2 Green Ch. 563 ; *Beverly* v. *Walden*, 20 Gratt. 147.

Where a legal capacity is shown to exist in the grantor, and he had sufficient understanding to clearly comprehend the nature of the business, and he consented freely to the special matter about which he was engaged, and no fraud or undue influence is shown to have been had to bring about the result, the validity of the deed cannot be impeached: however unreasonable, imprudent or unaccountable it may seem to others. It is not the propriety or impropriety of the disposition, but the capacity to make it, and the fact that it was freely made, with the full assent of the grantor, that must control the judgment of the court: *Greer* v. *Greer*, 9 Gratt. 330. It is the duty of an appellate court, in reviewing a decree founded on the verdict of a jury, rendered on an issue out of chancery, to look to the state of the proofs at the time the issue was ordered; and if satisfied that the chancellor had improperly exercised his discretion in directing the issue, to render a decree notwithstanding the verdict, according to the merits, as disclosed by the proofs, on the hearing when the issue was ordered. *Smith's adm'r.* v. *Betty et al.*, 11 Gratt. 760, and cases there cited. It is true that the chancellor may, in the exercise of his discretion, either direct an issue or refuse to do so ; but this discretion must be properly exercised, and a mistake in its exercise is just ground of appeal. *Wise* v. *Lamb*, 9 Gratt. 294. *Beverly* v. *Walden*, 20 Gratt. 154. Where the evidence is conflicting, or there is contradictory evidence between persons of equal

credit, and equal means of information, and the evidence is so equally balanced that it becomes doubtful which scale preponderates, an issue will be proper : *Ibid* 309.

· There are certain excepted cases referred to by Judge Lee in his opinion in *Wise* v. *Lamb,* not governed by the above rule; but this case is not one of them.

I do not desire to go outside of the Virginia and West Virginia authorities on this subject. There is an unbroken line of authorities on the subject in Virginia, all before the separation, being part of the law of this State, are as binding on this Court as its own decisions. The principles of the Virginia decisions on the subject, have been approved in *Powell* v. *Batson,* 4 W. Va., 610: *Henry* v. *Davis,* 7 W. Va., 715; *Nease* v. *Capehart,* 8 W. Va., 95, and *Arnold* v. *Arnold, supra.*

As I understand the authorties in Virginia and this State, and they are not in conflict with the general current of decisions, where there is such a conflict of evidence, that it is so nearly balanced, as to make it doubtful, on which side is the preponderance, an issue ought to be directed; and where, though there be a conflict, but not of such a character, no issue should be directed; and if it is improperly directed in the one case or refused in the other, such mistake by the chancellor in the exercise of his discretion will be corrected on appeal. Such doubt in the mind of the chancellor must not be a factitious, but a reasonable one, justified by such conflict of the evidence. It sometimes happens that in particular cases, where fraud is charged, for instance, and there is much contention between parties in the neighborhood, and many have taken sides in the contest, that the Judge is tempted to evade the responsibility the law imposes on him, by submitting the question to a jury. No such evasion can be tolerated; it is the right of the parties litigant to have the judgment of the chancellor upon the subject; and one side or the other in exciting cases, might be unjustly injured by undue pressure being brought

to bear upon the jury ; and it is only under the circumstances, we have indicated, that the judge is permitted to escape the responsibility of a decision by directing an issue. After an issue has been directed and the jury have found a verdict, it is not often that a judge will decree the other way, although he may do so.  It is argued by plaintiffs, counsel, that section 4 of chapter 131 authorizes a court of equity to direct an issue in any case.  The section is as follows:

"A circuit court, wherein a chancery case is pending, may direct an issue to be tried in such court, or in any other circuit court."

This section of the Code clearly does not change the general chancery practice as to the direction of issues. It only specifies *where* the issue *may be tried* in the circuit court that directs it, or in any other circuit court it may designate.   It is also contended by counsel for appellees, that by the 59th section of chapter 125 of the Code the effect formerly given to an answer is destroyed.  This is intended to meet the arguments of appellants' counsel, founded on the following language of Judge Christian, in *Beverly* v. *Walden, supra* 154 : "When the allegations of the bill are positively denied by the answer, and the plaintiff has failed to furnish two witnesses, or one witness, and strong corroborating circumstances, in support of the bill, it is error in the chancellor to order an issue ; that no issue should be ordered until the plaintiff has thrown the burden of proof on the defendant; that until the onus is shifted and the case rendered doubtful by the conflicting evidence of the opposing parties, the defendant cannot be deprived, by an order for an issue, of his right to a decision by the court on the case, as made by the pleadings and proofs."  If the onus were shifted, still it would not be proper to direct an issue, unless "the case is rendered doubtful by the conflicting evidence of the opposing parties."

Section 59 of chapter 125, is as follows:

"When a defendant in equity shall in his answer deny any material allegation of the bill, the effect of such denial shall only be to put the plaintiff on satisfactory proof of the truth of such allegation; and any evidence, which satisfies the court or jury of the truth thereof, shall be sufficient to establish the same."

Under this section of the Code it is true, that the effect an answer formerly had, as held in many cases in Virginia, is destroyed; its only effect now is to put the plaintiff on proof of his case, when all the allegations are denied, or on proof of such parts as are denied. It is no longer necessary to have two witnesses, or one witness, and strong corroborating circumstances, to overthrow an answer in response to the bill; it may now be overthrown by any proof, that satisfies the court or jury of the truth of the bill. But this does not change the rule we have laid down governing courts in directing issues.

It is argued with confidence in their brief by counsel for appellees, that: "An appellate court will not reverse the decree of the court below, because an issue has been directed, *if there be a conflict of testimony*, although after analyzing and weighing the testimony, it may differ with the inferior court as to the effect of the evidence. Then to determine whether the decree should be reversed, it is necessary to ascertain whether there be a *conflict of evidence*; this is the sole question for the consideration of the appellate court; if there is such a conflict, then, whatever may be the opinion of the court as to the preponderance of testimony, the decree of the inferior tribunal must stand." In effect, it is contended that, if there is a *conflict of testimony* in the cause, and the inferior court directs an issue, it cannot be inquired into in the appellate court, whether there was such a conflict of testimony, as made the question a doubtful one. This position is wholly untenable; it reverses all the authorities in Virginia on the subject of directing issues; it is in effect to say that in almost any chancery

cause, where two or three witnesses have sworn one way on one side, and one witness of the same credit, testifies to the reverse, there being a conflict of testimony, the court may direct an issue. If this be law, we might as well abolish our chancery courts at once, or wipe out the line that separates them from courts of law.

According to the principles above declared should the circuit court of Greenbrier county have directed the issue in these causes ?

At the time the issue was directed, the court did not think it necessary to direct any inquiry as to fraud or undue influence being practiced upon Mr. Jarrett. The fraud charged in the bills is denied by the answers, and I think there is no evidence of fraud in the record ; there are no circumstances proved from which fraud could be satisfactorily inferred. There is no evidence in the record as to any of the defendants importuning old Mr. Jarrett to execute the deeds, or either of them, unless it may be the evidence of Rosanna Argabrite, and unless it may be gathered from the circumstances, which, to my mind, are wholly insufficient to sustain that charge in the bill. There is certainly no evidence in the cause that said deeds, or either of them, was procured by undue influence. I do not deem it necessary to discuss the question of inadequacy of consideration ; there is evidence in the record tending to prove, that the lands sold for near what they were worth; but the weight of evidence is, that they were worth much more than they were sold for. But it is well settled, that mere inadequacy of consideration is not sufficient to justify a court of equity in cancelling a deed or contract. The question submitted was, whether at the time of the execution of the two deeds dated March 24, 1868, and also the deed to Samuel Leonard, dated July 23, 1867, the said James Jarrett was mentally capable of making said deeds, or either of them : and if either of them and not the other, which one. How stood the proof on this question at that time ?

In the extended statement of the case, I have not given

a synopsis of any evidence except that bearing upon this question. If upon the proofs at that time, the evidence was so conflicting that it was so nearly balanced as to make it doubtful on which side was the preponderance, then the issue was proper; but if such was not the case, it was the duty of the chancellor to have rendered his decree on the proofs as they then stood.

The witnesses, whose depositions were taken in the cause, may be divided into four classes:

1st. Those who gave merely opinions as to the mental capacity of the grantor, and gave no reasons therefor.

2d. Those who gave opinions, and their reasons therefor.

3d. Physicians.

4th. Witnesses present at the execution of the deeds.

The number of witnesses who were examined as to the capacity of the grantor to execute the deeds, was nearly sixty, of whom about forty were examined for the plaintiffs, and about twenty for the defendants. Quite a number of witnesses on both sides gave their opinions, not based on any, or on very frivolous reasons therefor; and their testimony is not entitled to much, if any weight. If the cause stood alone upon the testimony of Mrs. Argabrite and Dr. Clay, all the deeds would have to be cancelled. But they both prove too much. Mrs. Argabrite is just as positive that her father, the grantor, was not capable of executing a deed in 1862, as she was that he was not competent to execute the deeds to her brothers, James and Samuel, in 1868. On cross-examination she throws discredit on her whole testimony, and it seems to me, gives the reason why her opinion is so strong.

This question was propounded to her: "You say that from 1862 to the day of your father's death, you do not think he was capable of transacting business; did he not transact a great deal of business during that time?" She answered: "Yes, sir, he did, and he did it satisfactorily with honest people, but at other times I

was not so well satisfied with it." That is, he was capable to transact business with honest people, but not with dishonest ones; he was capable, but a dishonest person might take the advantage of him. During this period she had made a contract with her father to live with him and take care of him at the price of $1,000.00 per year, and at the time doubtless thought him capable of making such a contract; but when she thought he had sold the land to her brothers James and Samuel, too cheaply, she "was not so well satisfied with it." Dr. Clay became a good deal entangled during his cross-examination. He says, "according to his opinion his (Mr. Jarrett's) mind was in a state of imbecility previous to 1863, and it became worse afterwards." Then he must have been imbecile in 1862 according to Dr. Clay. But while Dr. Clay and Mrs. Argabrite both say that long prior to July 23, 1867, when the deed to Samuel Leonard was executed, he was incapable of transacting any business; yet H. M. Mathews, who wrote the said deed, in Mr. Jarrett's presence and at his request, eight months before the deeds to Samuel and James Jarrett were executed, in answer to a question, said: "I thought of course he was in a condition to make, and capable of making, the deed."

With the exception of the evidence of Mrs. Argabrite, there is very little in any of the reasons given by witnesses as the ground of their opinions, that tended to show that Mr. Jarrett was not of sound mind.

Two physicians testified for the plaintiffs. I have spoken of the testimony of the son-in-law, Dr. Clay; the other was Dr. Prickett, who deposed that, in his opinion, Mr. Jarrett was not competent to transact business of any great importance; says he was not very well acquainted with him; made him two professional visits in the summer of 1867; he gives the learned opinion that "the mind sympathizes with and shares the weakness and decline of body incident to extreme old age; thought that all men, pretty much, when they arrived at

80

Mr. Jarrett's age, are of feeble mind; that the mind does suffer with the body;" and this is all the reason he has for thinking him incompetent to transact business. There are many cases of men who were as old as Mr. Jarrett, and much older, whose contracts were never questioned, and many cases in the books, where the contracts, deeds and wills of such old men have been sustained.

Dr. Creigh was well acquainted with Mr. Jarrett, and in the latter part of August or first of September 1868 saw him frequently; was his physician in 1866, 1867 and 1868; talked with him, and he says he "never saw him when he did not have entire possession of his faculties, and was uniformly struck with the clear and concise manner, in which he expressed his feelings and sensations.

Dr. Rupert and also Dr. Caldwell testified to his mental capacity.

The weight of the medical testimony is clearly in favor of the grantor's capacity.

The testimony of those present at the execution of the deeds is entitled to peculiar weight.

Mr. Handly the surveyor details facts and circumstances, that show a mind capable of transacting very important business. He went to his place to survey for him in February 1868, and he had the deeds of his tracts of land on his desk; described the lines to the surveyor with particularity : told him he wanted a connected survey made, and how to make it; just where the lines would run, and the surveyor found that his description was correct: he told him he was going to sell his lands to his son James; that he wanted him (James) to live with him; the surveyor was with him some time, and his mind was clear.    When he came to his house in March 1868, James was there, also Samuel; the old gentleman seemed indisposed to do anything; Samuel was dissatisfied because the land was all going to be sold to James, he

wanted a part of it; the other children were objecting to the sale, or a part of them were; he evidently wanted James to have the land, but wanted Samuel satisfied; when Samuel had made an arrangement with James to take part of the land, and expressed his satisfaction, the old man was also satisfied and signed the deeds. James H. Arbuckle was in his room the day the deeds were written; he talked with him. He says: "I thought he was just as much at himself as I ever had seen him; whether he was in a fix to make a contract or not, I don't know; he was talking the common news of the neighborhood, and made many inquiries of me." On the 26th of March 1868 Mr. Jarrett acknowledged the deeds before S. R. Huffman, a justice of Greenbrier county, and he says he was then capable of understanding a deed, he had some conversation with him, "he appeared to be perfectly rational."

On the whole testimony I think the preponderance of the testimony, at the time the issue was directed, was clearly in favor of the capacity of James Jarrett on the 24th and 26th days of March 1864 to make the deeds to James Jarrett and Samuel Jarrett, respectively, and that the said issue ought not to have been directed, and that therefore there is error in the decree pronounced in these causes on the 16th day of June 1873, directing the issue, and also in the decree of the 26th day of November 1873, setting aside and annulling said deeds respectively; and the said decrees are reversed with costs in each of said suits respectively to the appellants against the appellees, and this court proceeding to render such decree as the circuit court should have rendered, it is, notwithstanding the verdict of the jury, adjudged, ordered and decreed, that in these suits respectively, the complainants' bills be dismissed, and that the defendants in each of said suits recover of the plaintiffs their costs about their defense expended.

Judges GREEN and HAYMOND concurred. MOORE,

1877.
Special Term.

Jarrett et a.
v.
Jarrett et a .

JUDGE, concurred in the points adjudicated, but thought this a proper case for the direction of an issue out of chancery.

DECREE REVERSED.