# WHEELING.

## MAHNKE v. NEALE.

Submitted June 16, 1883—Decided December 8, 1883.

1. The execution of a negotiable note from one member of a partnership to the other, for the balance found due to him upon a set-

tlement of the partnership accounts, is conclusive upon such partner as to the correctness of such settlement, in the absence of accident, mistake or fraud in making such settlement. (p. 80.)

2. A member of such partnership seeking to re-open such settlement, on the ground of accident, mistake or fraud therein must allege and prove the particular facts wherein such accident, mistake or fraud consists, and failing to do so, his bill will be dismissed at the hearing. (p. 80.)

3. A court of chancery may in its discretion, when the evidence in regard to any material fact properly in issue in the cause, is conflicting, and the weight of the testimony is so nearly balanced that it is unable to determine on which side it preponderates, direct an issue, as to *such facts*, to be tried by a jury. (p. 81.)

4. But this is a legal, and not a mere arbitrary discretion, and therefore if the court in a case where the evidence clearly preponderates in favor of, or against any material fact at issue in the cause, improperly directs an issue as to such facts, to be tried by a jury, the decree directing such issue will be reversed, although the evidence in regard to such facts may have been conflicting. (p. 82.)

5. The question, whether it was proper, or improper in any particular case to direct an issue of fact therein, to be tried by a jury, must be determined by the proofs in the cause at the time such issue was directed. (p. 82.)

6. Where a court of chancery in a case pending before it, directs an issue of fact therein to be tried by a jury, except where the same is prescribed by some statute, and the cause is carried to the Appellate Court, such court will look into the evidence which was in the cause at the time such issue was directed, and if they find, that at *that time* there was a clear preponderance of evidence in favor of, or against the fact as to which such issue was directed, it will reverse the decree directing such issue, and all subsequent proceedings in the cause, and render such decree therein as the court below ought to have rendered at the time such issue was directed. (p 82.)

7. A case wherein the decree of the circuit court, directing certain issues of fact to be tried by a jury, when the proofs in the cause at that time, clearly preponderated against the facts as to which such issues were directed, and where the said decree and all proceedings subsequent thereto were set aside, and the bill dismissed. (p. 86.)

The facts of the case appear in the opinion of the Court.

*John A. Hutchinson* for appellant.

*Loomis & Tavenner* for appellee.

WOODS, JUDGE:

F. I. II. Mahnke at the April rules, 1874, filed his bill verified by his affidavit in the circuit court of Wood county, against Wm. H. Neale and Joseph L. Neale, alleging that in April, 1873, being then engaged in the business of a dairyman in Parkersburg, he and said Wm. H. Neal entered into a partnership for the purpose of carrying on said business on the following terms: They were to keep a stock of cows, the price whereof was to be borne between them; said Neal to pay two thirds, and to have the milking done at his sole expense, and plaintiff to furnish horses and wagon and deliver milk to customers at his sole expense, and other expenses, as well profits and losses, to be borne and divided between them in the proportion of two thirds by Neal, and one third by plaintiff; that on the 15th April, 1873, when they entered upon the business together, plaintiff had thirteen cows of the value of twenty-eight dollars each, for which said Neale was to pay him two thirds thereof, amounting to two hundred and forty-two dollars and sixty-six and two third cents; shortly thereafter, said Neale took his son Joseph in with him, who became a partner with said Wm. H. Neale, so that the business was carried on by the partnership composed of plaintiff and Neale & Co., the said Wm. II. and Joseph Neale composing the firm of Neal & Co.; that the books and accounts were kept by said Neale & Co., who transacted all the business in buying and selling the cows—while the plaintiff received and delivered the milk to the customers and paid over the proceeds to the *said Neale;* that the business was carried on until the 15th of August, 1873, when said William Neale became dissatisfied, claiming that plaintiff was greatly in arrears to him and refused to let him have any more milk, or to let him have his part of the cows purchased with the partnership moneys, but allowed said Joseph to take the whole proceeds of the dairy, and demanded an immediate settlement of their partnership transactions; that the said Neale & Co. presented to plaintiff a

statement of what they claimed to be the amount due them on settlement of said partnership transactions; claiming that after allowing all just credits to plaintiff, he was indebted to them in the sum of four hundred and sixty-eight dollars, and demanded an immediate settlement of the same, and refused to allow plaintiff to take away his part of the cows, until the same was paid; that being anxious to get his cows so as to continue his business, and save himself from serious injury by disappointing his customers with whom he had made engagements to supply them with milk, which he could only do by providing for the payment of said Neale's unjust demands, he paid him one hundred and sixty-eight dollars cash and executed to him his negotiable note for three hundred dollars, which he afterwards paid to his endorsee. Plaintiff avers that at the time he paid said four hundred and sixty-eight dollars he was not "*indebted to his co-partner*" a cent, but on the contrary said Wm. H. Neale & Son on a fair settlement were justly indebted to him in at least six hundred dollars:—that he was wholly dependent on his business for the support of himself and family, and was under the necessity of yielding to the inequitable demands of said defendants or be measurably ruined in his business, and he filed as part of his bill an exhibit marked "A," showing that he has overpaid his *co-partner*, the sum of —— dollars, which at the least, he is entitled to receive upon a just settlement, and concludes with a prayer that the defendants fully answer the bill on oath; that they make a true exhibit of all money that they or either of them have received from plaintiff on account of said partnership transactions, and of all moneys received for partnership cows or other property sold, the number of cows purchased, from whom bought, and the prices paid therefor; the quantity of milk furnished the plaintiff, and the quantities returned, the moneys collected from customers for milk sold, and the names of such customers, and to furnish all other information in their power touching said partnership transactions, and for general relief.

The bill at the May rules, 1874, was taken for confessed, but at the July term, 1874, of said court, the defendants demurred to the bill, which demurrer was overruled and the court entered a decree therein, reciting that not having suffi-

cient —— before it to render a proper decree in the cause referred it to a commissioner, who was instructed "to take and state an account between the parties, of all their partnership transactions," and was authorized to interrogate either or any of the parties on oath, together with such other witnesses as either party might produce before him, and to return his report with proofs and vouchers, &c. The commissioner commenced the execution of said order of reference on the 27th of May, 1875, when the parties plaintiff and defendants appeared before him in person and by counsel and he took the depositions of the parties and of all witnesses produced, until the 10th of June, 1875, "when both parties announced that they had no further evidence to offer." The depositions so taken, and also the written agreement of the plaintiff and said Wm. H. Neale, forming said partnership, were produced in evidence before said commissioner, the agreement was returned with his report, and is in these words:

"An article of agreement entered into the 15th of April, 1873, between Wm. H. Neale and F. I. H. Mahnke:

. "Wm. H. Neale, of the first part, agrees to furnish two thirds of the capital to carry on a dairy, and to furnish all feed required to keep cows in first-class order, and the said Wm. H. Neale to receive two thirds of profits during grass season and three fourths of profits while using dry feed. And said F. I. H. Mahnke agrees to furnish one third of capital for same dairy, and to receive milk, buttermilk, cream and butter at residence of said Wm. H. Neale and deliver the same in Parkersburg to customers, and to neither buy milk, cream, buttermilk or butter in no case whatsoever that it will affect the said dairy; and the said F. I. H. Mahnke to give account of sales at the end of each week, and the said F. I. H. Mahnke to receive one third profits during grass season and one fourth profits when on dry feed, and a settlement each month for sales made.

"WM. H. NEALE,

"F. I. H. MAHNKE."

The commissioner's report made under said order of reference was returned and filed on the 5th of November, 1875. The plaintiff took the depositions of S. J. Langfit, R. M. Hull, Bennett Cook and himself. R. M. Hull only testifies

that he bought from Wm. H. Neale in the summer of 1873, six cows at the price of two hundred dollars. S. J. Langfit only testifies that "about the month of May, 1873, she made an arrangement with Joseph Neale, son of Wm. Neale, who was delivering milk *for his father* to furnish her milk at five cents a quart; and that as she consumed a good deal, he furnished her milk at hotel rates, and this arrangement continued until October, when the price was changed to thirty-five cents per gallon.

The deposition of the plaintiff is in the following words and figures:

1st Question—State whether you entered into a partnership with Wm. H. Neale on the 15th day of April, 1873, in the dairy business; and if so, state all about your business in that connection.

Answer—I did enter into such a partnership. I was to furnish one third of the cows; Wm. H. Neale was to furnish two thirds of the cows and the feed; Joseph Neale was to do the milking, and we were to share equally, share and share alike, in the proceeds arising in the sale of milk—I one third, Wm. H. Neale one third and Joseph Neale one third. When that contract was made Joseph Neale was present. That agreement was made a month before the written contract exhibited by Wm. H. Neale was made. I mean the agreement of partnership was so made. When we had run about a month, Mr. W. H. Neale requested me to make a report of the amount of milk I had sold, which I done. The within contract was made two or three days after we commenced running, and gave me a copy of it. I lost the copy and never read it over. I can't read English. I heard it read over the day it was written, but I did not understand that Joe was left out of the partnership. It was read over to me the way we had agreed. Mr. Wm. H. Neale afterwards spoke to me of Joe as a partner. Joe always spoke to me as a partner. We had more milk than I could sell, and I wanted Mr. Neale to fix up a room so we could make butter and cheese. He said he wouldn't incur any more expense. I continued in the partnership until September 15, 1873. The next morning after Mr. Neale said he wouldn't incur any more expense, I told Joe I wanted my one third of the

cows. The same evening Mr. Neale told me that I was indebted to the company over three hundred dollars, and proposed charging me at the rate of thirty-two and one half cents per gallon for the milk retailed which I had sold at thirty cents. At the same time, Wm. H. Neale asked me if he hadn't —— send Joe around with me for a few days so that I could show him the customers. After he learned the customers, Wm. H. Neale told me that he wanted him to keep at it for a month. During this month I wanted my cows and Wm. H. Neale wanted a settlement with me, Joe still bringing the milk to town, and I to the sixth ward and to the hotels, if he hadn't enough to supply them. William Neale didn't demand a settlement as soon as Joe learned the customers, but claimed that I owed him four hundred and sixty-eight dollars and ninety-eight cents. He refused to give up my share of the cows until I gave him my note for three hundred dollars and gave him one hundred and sixty-eight dollars and ninety-eight cents in cash. I done this in order to get my cows, which he held for fifteen days. The note given was negotiable. At the time I gave the note and paid one hundred and sixty-eight dollars and ninety-eight cents, I had overpaid him, and did not owe him anything.

2d Question—State how much milk you received from the 15th day of April, 1873, to the 15th day of August, 1873.

Answer—To May 15th, 1873, I received...................... 745 gallons.
From May 15 to June 15, I received............1,135   "
From June 15 to July 15, "     "     ............1,141   "
From July 15 to Aug. 15, "     ".  ............1,202   "

Making in all.......................................4,223   "
Of this amount I returned unsold................ 212   "

Leaving the amount sold by me................4,011   "

I didn't sell as much as one-half of it at retail, but in a settlement, and to satisfy Mr. Neale, I was willing to have one-half charged at retail, which I sold at eight cents per quart. In selling it is fair to estimate that at wholesale there is a loss of one-sixteenth and at retail one-eighth from the gross amount.

3d Question—State how much money you paid to the Neales out of the milk money.

Answer—I paid Joseph Neale between April 15 and May 15..$  64  00
          I paid Wm. H. Neale between April 15 and May 15..   64  00
          I paid Wm. H. Neale between May 15 and June 15..   80  00
          I paid Joseph Neale between June 15 and July 15..   80  00
          I paid Joseph Neale between June 15 and July 15..  288  75
          I paid Wm. H. Neale between June 15 and July 15..  296  09
          I paid Wm. H. Neale between July 15 and Aug. 15..  160  00
          I paid Wm. H. Neale through Joseph Neale........   16  00
          I paid Wm. H. Neale by negotiable note, Sept.
          15th, 1873................................  300  00
          I paid Wm. H. Neale, cash, Sept. 15th, 1873........  168  98
          I paid Wm. H. Neale 2 loads of hay July, 1873......   25  00
          I paid Wm. H. Neale use of cows from Sept. 15 to
          Oct. 1........................................   39  00
          I paid partnership cows sold by Wm. H. Neal,
          am't for.....................................  400  00

Wm. H. Neale & Co. are entitled to a credit of six hundred and twelve dollars and twelve cents for their part of the milk sold during the periods of the partnership. My understanding about the written agreement was, that Joseph Neale's name was in it, according to our agreement made before it was written.

(Mr. W. H. Neale here admits to the commissioner that whatever money · Mahnke paid Joseph Neale was by his order, and is properly chargeable against him, although denying that Joseph Neale was a partner.)

CROSS-EXAMINED BY W. H. NEALE.

I first saw Wm. H. Neale in regard to going into partnership, at his house. Frank Easily was with me. I next saw him at his house. I don't recollect seeing Joseph Neale at that time. I asked Mr. Neale at that time to come down and look at my cows. He came down and looked at them. We both agreed the cows, thirteen in number, were worth twenty-eight dollars a head. I delivered the cows to Neale's farm on the evening of April 14, 1873. I went with them. I didn't see or hear about the article on that evening.. It was a week or so after that before the article in writing was signed. I got the milk on the morning of April 15. Joe milked and attended to the cows and delivered the milk to me. I didn't tell Wm. H. Neale on that morning that I wanted every gallon measured. I have seen the two pass

books now shown me. I paid Wm. H. Neale and Joseph
Neale sixty-four dollars each, between April 15 and May 15
in cash. Wm. H. Neale told me to pay the money to Joe—
that Joe was an equal partner. In the second month, I paid
Wm. H. and Joseph Neale eighty dollars apiece. I paid
this money in July, but it was on account of the milk sold
from May 15 to June 15. I did not agree to make a report
every week. In the third month I paid W. H. Neale two
hundred and ninety-six dollars and nine cents. In the fourth
month I paid him one hundred and sixty dollars, which was
the last money paid him until September 15, in order to get
my cows. I never told Mr. Neale that I had retained two
thirds of the amount sold. I never told him that I was too
wasteful of the milk. I never told Mrs. Neale that I wanted
her to take my books; that I couldn't tell anything about
them. I didn't hire Joseph Neale to drive that milk wagon.
I don't know who milked while Joe was running a wagon.
I never told the customers not to pay him any money, but
Joe collected all the money for the milk sold for a month.
Wm. H. Neale mowed my meadow for me at thirty dollars.
He paid Mr. Clark twelve dollars and sixty cents for hauling
hay for me and six dollars for stacking. Wm. H. Neale
sold two loads of hay to Preston that belonged to me; that is
what the twenty-five dollars is charged for. Mr. Neale sold
the hay out of the meadow and I never got anything for it.
I only bought and paid for one cow. Wm. H. Neale
bought three cows of R. at one hundred dollars, and I paid
one third of it. He bought one cow of Harden at forty dol-
lars, and I paid one third of it, outside of what I have charged
in my account. He bought an Ohio cow at thirty dollars, and
I paid one third of it after he bought the cow. I paid one third
of the costs of all cows soon after they were purchased, except
six cows bought instead of six sold to Hull, which cost the
same as the six sold to Hull. We had a settlement about
October 1, 1873. I brought Bennett Cook, jr., along to note
down the settlement so that I could get my cows. We went
up stairs to settle. Mr. Neale did not tell me to say whether
anything was wrong in calling over the items of account.
When I said anything was right Bennett Cook, jr., put it
down. I said everything was right because I didn't under-

stand it. I was not shown any books. I did not tell Mr. Neale after the settlement was. over that it was all right. After the settlement we went out and divided the cows by me taking one, and Neale two alternately. There was two cows left in division, which Neale bought of the partnership at twenty-eight dollars apiece, and one third of that belonged to me. I then gave Neale my note for three hundred dollars and one hundred and sixty-eight dollars and ninety-eight cents cash. There were two calves. I bought them at eight dollars, paying Mr. Neale two-thirds of the sum. I never agreed to have the dissolution published in the newspapers and I pay half of it. I did not at the time of the settlement say I was satisfied with it. I got seven cows in the division of the twenty-three cows, and pay for the one third of two cows held by Neale. I never agreed to pay the discount on the note.

Question—At the time of the alleged settlement, state whether Bennett Cook advised you to give the three hundred dollar note and pay the balance of the four hundred and sixty-eight dollars and ninety-eight cents claimed by Mr. Neale?

Answer—Yes, sir, he did.

Question—Did you ever admit that you were owing Mr. Neale that amount on settlement?

Answer—No, sir. I had already overpaid him sixteen or twenty dollars. I gave him the note and paid him the money in order to get my cows.

Question—Did you express yourself satisfied or tell Mr. Neale that you were perfectly satisfied?

Answer—I did express myself satisfied in order to get my cows.

Question—Did you owe him anything like that amount of money at that time?

Answer—I did not.

Question—On a fair settlement, as nearly as you can ascertain, what does Mr. Neale now owe you?

Answer—About six hundred dollars.

CROSS-EXAMINED BY OKEY JOHNSON, COUNSEL FOR DEFENDANTS.

Question—Where did Bennett Cook, jr., give you this advice of which you speak?

Answer—I was there first and Bennett Cook was with me. Mr. Neale made a charge against me of four hundred and sixty-eight dollars and ninety-eight cents; then we came away and Bennett Cook advised me to pay the money and give the note, and then fight him on the note. Mr. Neale told me I couldn't get the cows unless I gave the note. Bennett Cook gave me this advice at his own house (and not in the presence of Mr. Neale.)

(Wm. Neale, by his counsel, objects to all advice given by Bennett Cooke, jr., in the absence of the defendant, Wm. H. Neale.)

And further deponent saith not.

The substance of the deposition of Bennett Cook is as follows:

"Was present at the settlement between plaintiff and Neale when a note of three hundred dollars was given, plaintiff wanted to get possession of his part of the cows, Neale refused to let him have them claiming that plaintiff owed him, plaintiff denied owing the amount Neale claimed. Neale wouldn't give up the cows unless plaintiff gave a deed of trust on them or a note or paid the money. Witness proposed to plaintiff to give a note *in order to get the cows*, as he could avoid the payment of the note as it was not right. Plaintiff was not satisfied with settlement, complained about it all the time and only entered into it to get his cows. Witness did none of the figuring, all done by Neale and his daughter-in-law, but witness did propose to plaintiff to give the note, get his cows and fight it out afterwards."

This was all the testimony on behalf of the plaintiff, in the cause at the time the decree was entered directing the issues to be tried by a jury.

The defendants took their own depositions and also the depositions of Alfred Lasfield, Henry C. Neale, and Lulu J. Neale, the wife of the defendant Joseph L. Neale, but as she is clearly incompetent as a witness on behalf of her husband, and as her testimony was for that reason excepted to, we have wholly disregarded it in reaching our conclusions.

The deposition of the defendant Joseph L. Neale is in substance as follows:

"All I received from plaintiff in any way was two hundred

and fourteen dollars and forty-seven cents. I did the milking
and measured it out night and morning to plaintiff.   The
amount of milk charged against plaintiff in Wm. H. Neale's
exhibit "A" is correct and is taken from the accounts which
I kept daily, plaintiff hired me to drive the wagon twenty-
two days at two dollars per day; and father paid me forty-four
dollars, which was allowed him in the settlement.   After the
partnership was formed between plaintiff and my father, Wm.
H. Neale, father employed me to do the milking and attend the
dairy, and I was to get for it one-half of my father's share of
the profits.  I didn't own anything in the dairy.   After the
settlement of September, 1873, I and father and plaintiff,
Ben Cook and my wife went out to the barnyard where the
cows were.   'Pa' and plaintiff drew for first choice, and 'pa'
got it.   'Pa' drew two at a time, and plaintiff one—until 'pa'
got fourteen and plaintiff seven—which left two over.   'Pa'
asked who should take the two cows? plaintiff told 'pa' to
take them.   'Pa' took them at twenty-eight dollars apiece
and settled with him for his third interest in them.   'Pa'
then said, 'Now, Mahnke, are you satisfied?'   He said, 'Oh,
yes, I am satisfied.'   Plaintiff then drove the cows away.
Next morning I saw plaintiff at U. S. Hotel and told him the
note was not right; that it was payable to Wm. H. Neale
instead of an indorser.   He gave me another note payable to
endorser and made it all right.   He told father he was selling
at wholesale one third of the milk at twenty cents per gallon
and the other two thirds at thirty-two cents per gallon, and
he agreed to all those prices for the milk he sold, and he
agreed to pay eight dollars discount on said note, and me
two dollars per day for driving wagon.   Every gallon of milk
was measured by me, and I always threw in a gallon and
when I drove the wagon it always held out.   I was present
at the settlement between plaintiff and Wm. H. Neale, con-
cerning their milk transactions.   I saw the three hundred
dollar note given and plaintiff made no objection to giving
the note.   I heard all conversation between them at the set-
tlement.   In that settlement plaintiff did not deny that he
owed my father.   They came down stairs and he gave the
note.   He and Bennett Cook asked father if it was all right.
Father said the note was not right, that it was payable to him

instead of to the endorsers. They told him they would draw up a new note, which they did the next day. Father did not require plaintiff to give deed of trust or note or anything before the cows were divided. My wife and Cook did the figuring at the settlement. Father did not refuse to have plaintiff's books considered at the settlement."

The testimony of Henry C. Neale is immaterial and need not be noticed. The witness, Lasfield, testified that he was present when the cows were divided between Mr. Neale and Mahnke and after the division Mr. Mahnke said "Mr. Neale I am very well satisfied." Bennett Cook was present at the time, and everything was friendly. Mr. Mahnke drove off his third of the cows, and Cooke went with him. Upon cross-examination the witness stated that he was present all the time during the division of the cows, heard all that was said, and that twenty-six cows were divided equally between them, which would give twelve and a half cows to each; that "in the first place they drove the cows out and Mr. Mahnke took one and Mr. Neale one, and then Mr. Mahnke took one and Mr. Neale one, and when they drove the last one out Mr. Neale asked Mr. Mahnke if he was satisfied, and he said certainly Mr. Neale;" that he had been a slave nearly all his life, and could not read or write, but that he often assisted in milking those cows. The defendant, Wm. H. Neale, in his deposition taken on the 1st day of June, 1875, testified as follows: "I file herewith an account marked "A" which is a transcript of my books, and which I belive to be correct.

EXHIBIT A.

F. I. H. MAHNKE,

*To William H. Neale,*　　　　　DR.

To milk sold and delivered by said Neale to said Mahnke as follows:

1873—From April 15th to May 1st.

| | | |
|---|---|---|
| 111 gals. @ 20c. per gal. | $22 20 | |
| 222 gals. @ 32c. per gal. | 71 04 | |
| | | $93 24 |
| For the month of May. | | |
| 348 gals. @ 20c. per gal. | 69 60 | |
| 697 gals. @ 32c. per gal. | 223 04 | |
| | | $292 64 |
| For the month of June. | | |
| 367 gals. @ 20c. per gal. | 73 40 | |
| 734 gals. @ 32c. per gal. | 234 88 | |
| | | $308 28 |

For the month of July.

| | | |
|---|---|---|
| 401 gals. @ 20c. per gal...... | 80 20 | |
| 802½ gals. @ 32c. per gal...... | 256 80 | |
| | | $337 00 |

For the month of August.

| | | |
|---|---|---|
| 438⅔ gals. @ 20c per gal...... | 87 73½ | |
| 887⅛ gals. @ 32c per gal...... | 280 74¾ | |
| | | $368 48 |

For the month of September.

| | | |
|---|---|---|
| 368⅔ gals. @ 20c per gal...... | 73 73½ | |
| 737⅛ gals. @ 32c per gal...... | 235 69⅔ | |
| | | $309 68 |

To milk delivered and sold by said Neale to said Mahnke for 6th ward, Parkersburg:
For the month of August.

| | | |
|---|---|---|
| 14 gals. @ 20c per gal...... | 2 80 | |
| 28 gals. @ 32c per gal...... | 8 96 | |
| | | $11 76 |

| | |
|---|---|
| Total...... | $1,721 08 |

1873.
For the month of September.

| | |
|---|---|
| 201 gals. @ 32c per gal...... | 64 32 |

To butter sold and delivered by said Neale to said Mahnke as follows:
1873.
For the month of April.

| | |
|---|---|
| 14½ lbs @ 35c pr lb...... | 4 98¾ |

For the month of May.

| | |
|---|---|
| 49¾ lbs @ 35c per lb...... | 16 41¼ |
| To 113 gals. buttermilk at 15c per gal...... | 16 95 |
| To 10 gals. cream @ 60c per gal...... | 6 00 |
| To money advanced and paid by said Neale for said Mahnke as his proportion (one-third) of the purchase-money for 17 cows...... | 209 41⅔ |
| To labor in meadow...... | 30 00 |
| Paid Clark & Scott...... | 12 90 |
| Paid Jos. Neale for stacking hay...... | 6 00 |
| To use of two horses and wagon and driver for the same, 22 days...... | 44 00 |
| To discount paid on note...... | 8 00 |
| To washing cans 152 days, @ 25c per day...... | 38 00 |
| To two calves...... | 10 00 |
| To pasturing dry cows (his ⅓ proportion)...... | 2 00 |
| To ice for keeping milk (his ⅓ proportion)...... | 6 66⅔ |
| To advertisement of dissolution (his proportion)... | 1 00 |
| | $2,197 73⅓ |

CR.

By said Mahnke's ⅓ interest in the milk, buttermilk, cream and butter sold and charged as above to him...... $609 91⅓

| | | |
|---|---:|---:|
| By cash paid by him for cows.................................... | 33 | 00 |
| By cash paid by him for cows.......................... | 21 | 60 |
| By cash paid by him for cows............................... | 10 | 00 |
| By cash.......................................................... | 50 | 00 |
| By cash received from Hull for cows, being his ⅓ pro- | | |
| portion ...................................................... | 56 | 67 |
| By negotiable note................................................... | 300 | 00 |
| By order on A. Als................................................ | 20 | 00 |
| By order on Blackford........................................... | 9 | 00 |
| Paid daughter ....................................................... | 4 | 00 |
| By cash paid in Dils' store...................'............... | 160 | 00 |
| By cash paid in Dils' store..................................... | 50 | 00 |

| | | |
|---|---:|---:|
| By p'd son, Joseph ..................................$214 | 47 | |
| By 2 barrels of salt.................................. 4 | 75 | |
| By outstanding acc't, his ⅓ part.......................... 53 | 00 | |
| By cow sold Joseph's wife, his ⅓ part.................... 10 | 00 | |

$1,609 40⅔

Balance due Wm. H. Neal...................................   $588 32⅔

On the 23d day of August, 1873, I examined the books and found one thousand seven hundred gallons of milk had gone out, and I was getting only fourteen cents a gallon for it. I asked Mahnke if he retailed one half of it, and he replied that he was retailing two thirds of it. He said he had been lavish of the milk, but he would repay me at the rate of thirty-two cents a gallon for two thirds of it and twenty cents a gallon for the amount at wholesale. This was in the presence of Joseph Neale. All the money Mahnke ever paid me is credited on my account, "Exhibit A." I never bought any hay of Mahnke or sold any for him, except to the U. S. Hotel. I took care of his meadow for him, and it seems two loads of hay were hauled away, for which he was never paid, and he appears to want me to pay for it. Mahnke hired Joseph Neale to drive the milk wagon at two dollars per day and told me to pay him, and I paid him forty-four dollars for it. I desire to say that the items of two hundred and fourteen dollars and forty-four cents on my account as paid Joseph Neale, I know nothing of except as Joseph Neale tells me.

CROSS-EXAMINED.

I never told Mahnke that I would furnish the ice, but Mahnke told me he would pay me for one third of it. I paid twenty dollars for the ice at Jenkins' sale. I never told

Mahnke I would like to get him one thousand dollars in debt and then kick him off the place.

And being recalled by defendants the said Wm. H. Neale, on the 10th of June, 1875, further testified as follows:

Question—State whether at the settlement between yourself and Mr. Mahnke, Bennett Cook had anything to do with the settlement?

Answer—Mr. Mahnke said to me that he brought Bennett Cook there to settle the business between the company. Bennett Cook, Mr. Mahnke and myself and Mrs. Neale went up stairs.   Mrs. Neale gave Bennett Cook a sheet of paper, and when Mrs. Neale call over the account, I asked Mahnke, "Is that right?" And he said "Yes," and Bennett Cook put down the amount on his paper.

Question—State whether you told Mahnke at the time of the settlement that he must give you a deed of trust on the cows, a note or the money before he could have his share of them?

Answer—I did not.

Question—When and where was the three hundred dollar note that you did receive executed?

Answer—I don't know where or when it was executed. The note was payable in sixty days.

Question—Did or did not Bennett Cook, jr., at the time of the settlement, propose to Mahnke to give the note, get his cows, and fight it out afterwards?

Answer—He did not.

Question—State whether Mahnke expressed himself satisfied with the settlement or otherwise; and if so, what he said?

Answer—He said he was perfectly satisfied.

Question—State whether at the time Mahnke denied that he owed the amount that you claimed?

Answer—He did not.

Question—State whether you had a conversation with Mahnke, at which Bennett Cook, jr., was present, in which you disavowed any intention of charging for Joseph driving the milk-wagon, saying that you wanted Joe to learn the routes and customers?

Answer—I had no such conversation. I did not refuse to let Mahnke's book be considered in the settlement.

Upon these allegations and proofs the commissioner reported that the defendant, Wm. H. Neale, was indebted to the plaintiff at the date of said settlement in the sum of one hundred and fifty-eight dollars and twenty cents. To this report the defendant, Wm. H. Neale, filed the following exceptions:

1st. According to the pleadings and proof in this cause, there was no partnership as set up in the bill between the complainant, Wm. H. Neale and Joseph L. Neale, nor between Neale & Co. and the complainant.

2d. Because the pleadings and proof show that there was a settlement of the partnership existing between the complainant and the defendant, Wm. H. Neale, and a note executed to close said settlement.

3d. Because, according to the pleadings and proof in the cause, there was and is nothing due from the defendant, Wm. H. Neale, to complainant.

For these and other reasons defendant excepts to said report.

No exceptions to any part of this report were made by the plaintiff.

At the January term, 1876, of said court the defendants filed their separate answers to the plaintiff's bill.

The answer of said Wm. H. Neale admits that he entered into a co-partnership with complainant according to the terms of said written agreement dated 15th April, 1873, signed by him and said plaintiff, but denies that he took his son into said partnership or that his son was liable for any losses that might occur, but avers that he employed his son to do that part of the work, he had bound himself to perform, and that for his labor he agreed to pay his son one half of his own share in the profits and this was his own private arrangement with which the plaintiff had nothing to do; he denies that any partnership ever existed between him and his son under the name of Neal & Co., or under any other name, or that any partnership was ever carried on between the plaintiff and Neale & Co., or that any partnership ever existed between said Mahnke, himself and said Joseph Neale, he denies

that the books were kept and the cows bought and sold by Neale & Co., and he avers that he bought and sold the cows, and that by the plaintiff's consent Mrs. Lulu Neale kept the accounts, and that said plaintiff agreed to account for one third of all the milk sold at twenty and the other two thirds at thirty-two cents per gallon, and that it was so entered on the books at the request of the plaintiff; he denies that the plaintiff's account filed, contains a correct account of the milk received and sold by him, and avers that the account filed by said respondent with his deposition marked "Exhibit A." is correct in all the items and shows the true account as it existed of all the dealings between him and said plaintiff in the dairy business, and that wherever the allegations of the plaintiff's bill differs from his said "Exhibit A." is untrue. The defendant further averred in said answer, that said partnership continued until the middle of September, 1873, when he became dissatisfied because he had reason to fear plaintiff would not pay him as he had fallen far behind; and he admits that he did claim that plaintiff was in arrears, and that he demanded a settlement of the partnership, and he says that the plaintiff assented thereto. He denies that he refused to let plaintiff have his part of the cows, for any other reason than that he was notified by Bennett Cook that he had a deed of trust on them for $——, which respondent paid off. He denies that either he or Joseph Neale ever received the proceeds of sales of milk or butter until after said settlement of their partnership and amicable dissolution thereof; and that *Neale & Co.* presented any account to plaintiff; he admits that he did inform plaintiff that he was indebted to him in four hundred and sixty-eight dollars and ninety-eight cents, or about that sum, and demanded a settlement, and that plaintiff did not object to it, and that by agreement, the plaintiff and Bennett Cook as his agent and friend, met Mrs. Lulu Neale at respondent's own house, and said Cook had paper and pencil and the account was called off and was agreed to by said plaintiff; that every item now on his said "Exhibit A." was on it at that time excepting said note of three hundred dollars, the eight dollars discount and the one dollar a part of the charge for advertising the dissolution of the partnership, and plaintiff and respondent did

then and there settle and the plaintiff paid all he owed except the three hundred dollars, for which he executed the note, and that they then divided the cows and when they were divided plaintiff drove his part away and then and there expressed himself well satisfied, and they then agreed that the partnership was dissolved; he further averred in his answer that on the next day after the settlement, and after the plaintiff had driven off his cows, said plaintiff, at respondent's request, executed to him a different note in lieu of the said note of three hundred dollars which was payable to the order of respondent, and made the same payable to the order of Charles Brunsing and Charles H. Shattuck, and endorsed by them to respondent. He denies that said settlement was procured by unfair and undue means, or that there was any fraud, accident or mistake in said settlement, or that there was any duress upon plaintiff to compel a settlement, and he insists that the settlement was made in good faith and was both fair and just. Respondent averred that he purchased all the cows except those owned by plaintiff, and that on them he paid him two hundred and forty-two dollars and sixty-six and two third cents and also a deed of trust on them which he had given to Bennett Cook before the partnership of which respondent at that time was ignorant.

The defendant, Joseph L. Neale, in his answer admits the existence of the said partnership between the plaintiff and his father, Wm. H. Neale, but denies explicitly every allegation of the bill which alleges the existence of any partnership between him and his father, or with the plaintiff, and avers that he was only employed by his father to do certain work for him, about the partnership business, for which he was to pay him so much, and that plaintiff had nothing to do with said arrangement between him and his father; he denies that any undue or unfair means, or any fraud or unfairness was practiced on the plaintiff to induce the plaintiff to make said settlement. The plaintiff upon the conclusion of the settlement expressed himself satisfied with it, and paid his father one hundred and sixty-eight dollars in money, and his note payable to the order of his father in bank, and he was given all the cows he claimed to be entitled to. After all this was done respondent by his father's directions told

plaintiff his father wanted the note in a different shape, and wanted it payable to the order of some other person, and plaintiff gave his father another note for three hundred dollars, payable to the order of C. H. Shattuck and Brunsing; that the plaintiff expressed himself satisfied with the settlement. The plaintiff was well acquainted with all the items in the account when the settlement was made, and made no objection to any item in the account. To both these answers the plaintiff replied generally, and on the 17th day of January, 1876, the circuit court entered the following decree:

"This day the defendants, William H. Neale and Joseph L. Neale, filed their respective answers to the complainant's bill, to each of which the complainant replied generally; and the defendant, Wm. H. Neale, filed exceptions to the report of Barua Powell, a master commissioner of this court; and this cause came on this day to be heard upon the bill, the exhibits filed, the separate answer of Wm. H. Neale and Joseph L. Neale, with general replication to each, the exceptions to commissioner's report, and proofs taken in the cause, and was argued by counsel. Upon consideration whereof, the court at this term declines to decide the said cause, and is of opinion that issues out of chancery should in this cause be directed. It is therefore adjudged, ordered and decreed that the following issues be directed in this cause to be tried before a jury upon the law side of this court, to-wit:

"1st. Was there or was there not a partnership in the dairy business existing between the complainant and the defendants, Wm. H. Neale and Joseph L. Neale, or complainant and Neale & Co.?

"2d. Was there a settlement between complainant and Wm. H. Neale, or between complainant and Neale & Co., of the partnership accounts in said dairy business?

"3d. Was there in said settlement, if any was made, any fraud on the part of said W. H. Neale, or any accident or mistake in said settlement, or was said settlement procured by said W. H. Neale by duress?

"Upon the trial of said issues, all proper depositions may be read now in the cause and such other legal evidence as may be offered."

On the 8th of October, 1877, the said issues were tried by a jury which rendered a verdict thereon in these words :

"'We, the jury, find for the defendants, W. H. and J. L. Neale on the first issue, and for the plaintiff, F. I. H. Mahnke, on the second and third issues.'

"And thereupon the defendants, by their counsel, moved the court to set aside so much of said verdict of the jurors aforesaid as finds for the plaintiff on the second and third issues and grant them a new trial. And the court takes time."

And on the 11th of October, 1877, the court entered thereon the following judgment:

"This day came again the parties, by their attorneys, and thereupon the motion of the defendants to set aside so much of the verdict of the jury in this case as finds for the plaintiff on the second and third issues being considered by the court, is overruled; and thereupon it is ordered that the finding of the said jury aforesaid be certified to the chancery side of this court."

The commissioner thereupon made a second report, and took some additional evidence, testimony which in no material degree strengthened or weakened the testimony already referred to. By this second report the defendant was found indebted to the plaintiff in the sum of one hundred and sixty-eight dollars and eighty cents, with interest from September 15, 1873. To this report the defendant Wm. H. Neale again excepted, and the said court on March 18, 1878, entered a final decree in favor of the plaintiff against the defendant Wm. H. Neale for two hundred and three dollars and thirty-two cents, with interest from March 4, 1878, until paid and the costs. From this decree the defendant William H. Neale obtained an appeal and *supersedeas* from this Court. To this decree the appellant has assigned various grounds of error, but from the view we take of this case it will only be necessary to consider the third, fourth and fifth of them. The *third* error assigned is that the circuit court erred in directing the said issues to be tried by a jury; the *fourth* is that it was error in said decree of January 17, 1876, to either direct such issues or said second order of reference ; and the *fifth* that the court erred in not setting aside and dis-

regarding said verdict. It will be unnecessary to consider
the second report of said commissioner, or the evidence
taken by him in the execution of the order recommitting the
cause to him. It will be apparent from the previous state-
ment of the pleadings that the plaintiff's bill can only be
maintained upon the ground that such a partnership as he
has alleged, existed between him and the defendant Wm.
H. Neale, or between him and the defendants Wm. H. Neale
and Joseph Neale, as the firm of *Neale & Co.*, and that the
partnership transactions of such firm have not been settled, and
this bill is brought to settle such partnership; or that if such
a settlement has been made, it is not valid and binding on
the plaintiff because of some mistake or fraud in said settle-
ment whereby the plaintiff has been wrongfully charged
with some loss or debt, or deprived of some property or
credit to which he was justly entitled, or that he has been by
some accident deprived of some profit or advantage which
but for such accident he would have realized or gained in
such settlement.

If the plaintiff's bill can be considered as seeking to estab-
lish the existence of a partnership between himself and Wm.
H. Neale and Joseph Neale in which each partner was to
share equally all losses and profits of the business, he has
been unfortunate in the allegations of his bill, and still more
so in the character of the testimony to support them. Every
such allegation of the creation or existence of any such part-
nership, is explicitly denied in the answer of each defendant,
and the plaintiff himself in his own deposition does not
venture to swear that any such contract ever existed, but
contents himself with the statement that his "understanding
was that Joseph Neale's name was in the written agreement,
according to our agreement made before it was written. I
heard it read over the day it was written, but I did not un-
derstand that Joe was left out of the partnership. It was
read over to me the way we had agreed. I lost the copy of
it, and never read it. I can't read English." The article of
agreement of the 15th of April, 1873, produced in evidence
and returned by the commissioner with his first report, dis-
proves that any partnership was thereby created between
plaintiff and said Wm. H. Neale and Joseph Neale either in

their individual capacity or as the firm of Neale & Co., but on the contrary proves that the partnership thereby created, was between the *plaintiff* and the *defendant Wm. H. Neale.* This fact must have been known and understood by the plaintiff, for his own deposition proves, that it was read over to him at the time he signed the agreement, and that a copy of it was then given to him, and although it may be true that he is not able to read English, yet there is nothing disclosed by himself or any witness examined in the cause, to induce the belief, that he was ignorant of the true character of the arrangement he had made, or of his rights and duties under the same. If this question had depended entirely upon the plaintiff's own testimony, in connection with said written agreement, the proof not only fails to support it, but clearly disproves it; but considered in connection with the denials in the answers, and the depositions of both of the defendants, and wholly disregarding the deposition of Lulu Neale, the wife of said Joseph Neale, the pretensions of the plaintiff, that any partnership existed between him and both of said defendants, are shown to be groundless, and the said bill as to the defendant, Joseph Neale, ought to have been dismissed.

The plaintiff, Wm. H. Neale, in his answer admits the partnership between the plaintiff and himself, and the continuance of it until September, 15, 1873, and that he claimed an indebtedness from the plaintiff of four hundred and sixty-eight dollars and ninety-eight cents, and the payment of one hundred and sixty-eight dollars and ninety-eight cents and the execution and payment of the note of three hundred dollars as alleged. The bill alleges, that at the settlement made between the plaintiff and defendant, when said balance of four hundred and sixty-eight dollars and ninety-eight cents was ascertained to be due to the plaintiff, he did not owe the defendant any sum whatever, but that on the contrary the defendants on a fair settlement were justly indebted to him at least six hundred dollars. So far as the liability of the defendant, Joseph L. Neale, is concerned, this allegation is wholly unsupported by the proofs in the cause. It will be observed that the plaintiff in his bill has wholly failed to state what items of account were in fact included in

said settlement. He does not state that any item claimed by him was forgotten, overlooked or disallowed; neither does he point out, any item claimed or allowed to said Wm. H. Neale, to which he was not justly entitled, or that any specific mistake or error, either in the computation, or in the manner of stating the account was then made, or subsequently discovered; neither is there any fact, or act on the part of said Wm. H. Neale having the appearance or color of fraud, or of any undue influence, alleged against him, but the plaintiff contents himself by simple allegations that the settlement was erroneous—that he could not get his share of the cows, unless he made the settlement, and that in order to get his cows, that he might continue his business, he made the settlement, paid the defendant, Wm. H. Neale, the sum of one hundred and sixty-eight dollars and ninety-eight cents, and executed to him his negotiable note for three hundred dollars for the residue of the amount claimed to be due to him. The defendant, Wm. H. Neale, in his answer denies that there was any mistake or error in the said settlement, or that he was guilty of any fraud, or that he used any undue influence to induce the plaintiff to make said settlement; that the same was in all respects just and fair to the plaintiff, and he relies upon the said settlement as final and conclusive as to all transactions of said partnership. The answers threw the burden of proof upon the plaintiff. It may be safely assumed that if upon a settlement a note or obligation be executed by one of the parties to the other, for the balance found due on such settlement, such note will be held conclusive upon all the items of the accounts so settled, unless it be clearly shown that there was in such settlement some mistake or fraud, which operated to the detriment of the of the party so found to be indebted; and it follows, that if such party would avoid the effect of such settlement, he must point out the alleged mistakes, omissions or errors existing therein, or the particular fraud complained of, so that the opposite party may be able to defend the settlement. *Parkersburg Nat. B'k v. Als*, 5 W. Va. 50.

It is insisted by the appellant, that the circuit court erred in directing said issues to be tried by a jury, and by not dis-

regarding their verdict on the final hearing, and in not entering a decree dismissing the plaintiff's bill *non obstante verdicto*.

In all chancery proceedings the chancellor is the judge of the facts, as well as of the law in the case, and the parties are entitled to have their cause tried by him. He is charged with the exceedingly delicate and often unpleasant duty of weighing the testimony of all the witnesses, and of determining the several degrees of credibility to which each is entitled. In all criminal proceedings the accused can only be convicted upon full proof of his guilt. In civil proceedings a preponderance of evidence for one side or the other is all that is required. It rarely happens that in any chancery cause, there is no conflict in the testimony, and it often happens that the conflict is very great, as to some material fact, but if the chancellor can determine on which side the evidence preponderates, it is his plain duty to determine the cause in favor of that preponderance. But it sometimes, though rarely happens, that the evidence tending to prove such material fact, is not only conflicting, but the weight of it is so evenly balanced, that the chancellor finds himself unable to determine on which side the evidence preponderates, and under such circumstances he is authorized to call in the aid of a jury, upon a feigned issue directed by himself, to determine where this preponderance is, and when the jury have determined this question and he is satisfied with their verdict, he accepts their finding as conclusive of the particular fact in question. It is the duty of the parties to the suit to produce before the chancellor all the evidence they have before the hearing of the cause, and failing in this he has no reason to complain, if in consequence thereof he decrees against him. When all the evidence has been so produced if the chancellor is unable properly to determine on which side the preponderance is, he may in his discretion direct an issue to be tried by a jury to determine that fact. But this discretion is not an unlimited and arbitrary one, which he may exercise at his pleasure, to avoid the unpleasant, and often delicate duty of determining this question for himself. This is one of the most solemn of the duties of his exalted station which is devolved upon him by the law, the discharge of which he cannot be permitted to decline, unless the con-

flict of the evidence is so great, and its weight is so nearly evenly balanced that he is unable to determine on which side the preponderance is; and if he improperly directs an issue when he ought to have determined the question for himself, this Court will reverse the decree directing such issue and will enter in the cause such decree as he ought to have entered. *Jarrett* v. *Jarrett*, 11 W. Va. 584; *Anderson* v. *Cranmer, Ib.* 563; *Pryor* v. *Adams*, 1 Call 382; 2 Call 369; *Smith* v. *Betty*, 11 Gratt. 752. These principles are the well established law of this State, as they have been and still are of the State of Virginia. Johnson, Judge, in delivering the opinion of this Court in *Jarrett* v. *Jarrett, supra*, lays down the rule upon the subject now under consideration in language so clear and forcible that nothing is left to be added: "Where there is such a conflict of evidence, that it is so nearly balanced as to make it doubtful on which side is the preponderance an issue ought to be directed; but where, though there be a conflict but not of *such a character*, no issue should be directed; and if it is improperly directed, in the one case, or refused in the other, such mistake of the chancellor will be corrected on appeal." And this Court, determining whether such issue was properly directed or not, will look into the testimony which was in the cause at the time such issue was directed, and if the court below could have properly determined the cause, it will reverse the decree directing such issue, and set aside all subsequent proceedings thereon and enter such decree as the circuit court ought to have entered notwithstanding said verdict.

Applying these legal principles to the pleadings and proofs in the cause when the cause was heard and the issues were directed, we will have but little difficulty in reaching a correct conclusion. At that time, all the evidence hereinbefore set forth was before the court. We have already seen that the proof was overwhelming, that no partnership of any kind had ever existed between the plaintiff and Wm. H. Neale and Joseph Neale, or between the plaintiff and Neale & Co., but the testimony of the witnesses, as well as the written agreement of April 15, 1873, showed conclusively that the only partnership which ever existed between the plaintiff and anybody, was between him and the defendant Wm. H.

Neale. There was absolutely no question as to which side of this question the testimony preponderated, there was scarcely any conflict, and the first issue directed was improperly directed, and there being no such partnership as that between the plaintiff and *Wm. H. Neale & Jos. Neale,* or between the plaintiff and *Neale & Co.,* there could be no settlement of accounts of a partnership which never existed. Neither was there any doubt as to the question whether there ever had been any settlement of the partnership transactions between the plaintiff and the defendant Wm. H. Neale. The bill alleged there had been such a settlement which the plaintiff was induced to make in order to obtain possession of his part of the cows, at which time he paid one hundred and sixty-eight dollars and ninety-eight cents to said Wm. H. Neale and executed to him his negotiable note for three hundred dollars. The said Wm. H. Neale admits in his answer there was such a settlement, insists that it was fair, in good faith, that the plaintiff then fell in debt four hundred and sixty-eight dollars and ninety-eight cents which he satisfied as stated by the plaintiff, and relies on it as a final settlement; the depositions of the plaintiff and his witness Cook prove there was such a settlement; the depositions of Wm. H. Neale and his witness Joseph Neale prove such settlement, and all of them, and also the witness Lasfield, prove that after the settlement was made the firm was dissolved, and the cows divided; the plaintiff and defendants and Lasfield prove that the plaintiff was satisfied with the settlement and the division of the stock. In the face of these facts proved in the record, and not contradicted, what conflict could be said to exist, as to the question whether such a settlement had been made? Not being in serious conflict with any other evidence in the cause, there ought not to have been any doubt on which side of that question the evidence preponderated. We conclude therefore that the second issue directed was also unnecessary and unauthorized. The third issue directed was to ascertain whether there "was in said settlement any fraud on the part of said Wm. H. Neale, or any accident or mistake in said settlement, or was the settlement by said Neale by duress?"

A sufficient objection to this issue is found in the fact

that the principal inquiries thereby directed are outside of the pleadings. The plaintiff in his bill has not alleged that any accident of any kind whatever occurred at such settlement; neither has he pointed out a single mistake then made to his prejudice or indeed of any kind, or of any amount, nor has he pretended to allege what items were in fact included in, or excluded from said settlement. Neither has he alleged any fraudulent act on the part of said defendants or either of them in making said settlement or in regard to any item thereof. There is nothing like legal duress alleged in the bill. The testimony in the cause at the time the issues were directed wholly fails to establish the fact that there was any accident, fraud, mistake or duress attending said settlement. We are therefore of opinion the said issues were improperly ordered and that the said decree of the 17th of January, 1877, for that cause will have to be reversed.

What decree should the court have rendered at the time the issues were ordered? All the allegations of the plaintiff's bill upon which he asked relief were explicitly and fully denied by the answers of Wm. H. Neale and Joseph Neale; the burden of proof was upon the plaintiff; all the testimony before referred to had been taken and filed; the commissioner's report found thereon had been returned and showed that the defendant W. H. Neale was indebted to the plaintiff one hundred and ninety-seven dollars and twenty cents with interest from the 1st of October, 1873. To this report the said Wm. H. Neale filed three exceptions to said report of which the first two have already in effect been decided to have been well taken. The third remains to be considered. It alleged that according to the pleadings and proofs in the cause there was and is nothing due from the said Wm. H. Neale to the plaintiff. The plaintiff not having excepted to the said commissioner's report, must be held to have admitted the same to be correct, not only as regards the principles, but as relates to the evidence on which it is founded. *McCurty* v. *Chalfant*, 14 W. Va. 531; *Ward* v. *Ward*, 21 W. Va. By this report it appears the plaintiff on the 15th of September, 1873, was chargeable with the proceeds of milk and butter sold to the amount of one thousand four hundred and eighty dollars and eighty-nine cents, of which said Wm. H. Neale

was entitled to receive from him nine hundred and eighty-seven dollars and twenty-six cents, and also the further sum of two hundred and sixty-six dollars and thirty-one cents for moneys advanced and paid to and for him, making one thousand two hundred and fifty-three dollars and fifty-seven cents. The plaintiff in his own deposition, proves that he paid Wm. H. Neale and to Jos. Neale, by the order of Wm. H. Neale, up to the 15th September, 1873, six several sums amounting in the aggregate to seven hundred and forty-four dollars, and claims the further sum of twenty-five dollars for two loads of hay, less the sum of thirteen dollars and thirty-three cents, the difference between the price of two cows and one calf, which is disproved by the deposition of said Wm. H. Neale. The plaintiff did not pretend that said Neale was indebted to him in any other sum of money received by or due from him. Throwing out all the facts proved by the said Wm. H. Neale and his witnesses, and giving the plaintiff full credit for all he paid, and the twenty-five dollars, to which on the proof he was not entitled, the credits to which the plaintiff was entitled at the date of said settlement amounted only to seven hundred and eighty-two dollars and thirty-three cents, which deducted from the sum of one thousand two hundred and fifty-three dollars and fifty-seven cents then in his hands belonging to said Wm. H. Neale, would have left the plaintiff in said defendant's debt on that day four hundred and seventy-one dollars and twenty-four cents instead of four hundred and sixty-eight dollars and ninety-eight cents, as stated in the bill. It is evident from the deposition of the said Wm. H. Neale, which is not contradicted that the commissioner ought to have charged the plaintiff with six thousand three hundred and forty-seven instead of five thousand six hundred and eighty-eight gallons of milk which at the prices proved and adopted by the commissioner would have increased the amount due said Neale over one hundred dollars; it is equally clear from the evidence that said Neale was entitled to receive the further sum of forty-four dollars, and that said plaintiff was not entitled to said credit of twenty-five dollars, and if these corrections be made, the plaintiff would have been indebted to the said Wm. H. Neale in a sum exceeding five hundred and fifty dollars.  Upon a careful consideration of

all the evidence in the cause at the time said issues were directed we are of opinion there was nothing due to the plaintiff from either of the defendants and that the said decree of the 17th of January, 1876, and the decree of the 10th day of April, 1878, are erroneous, and must be reversed, set aside and annulled. And this Court proceeding to render such decree as the said circuit court ought to have rendered it is adjudged, ordered and decreed that the plaintiff's said bill be dismissed with costs as well to the appellant in the said circuit court, as his costs by him about the prosecution of his appeal and *supersedeas* in this Court.

REVERSED.